UNITED STATES of America,
Plaintiff–Appellee,

v.

Cynthia JOHNSON,
Defendant–Appellant.

No. 88–1976.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 1, 1990.

Decided March 20, 1991.

Anton R. Valukas, U.S. Atty., Vilija Bilaisis, William V. Gallo, David J. Stetler, Victoria J. Peters, Howard M. Pearl, Asst. U.S. Atty., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for U.S.

Gary Senner, Jacqueline S. Glassman, Sanford M. Pastroff, Sonnenschein, Nath & Rosenthal, Chicago, Ill., for defendant-appellant.

Before CUMMINGS, FLAUM and RIPPLE, Circuit Judges.

CUMMINGS, Circuit Judge.

LaTee's Beauty School ("LaTee's") opened on the south side of Chicago in 1972, purportedly to train students to become licensed beauticians and barbers. LaTee's was a failure as an educational institution. No more than twenty or thirty students ever attended classes on a regular basis, even though student enrollment grew at times to around 200. From 1978 to 1984, for example, only twenty-two percent of LaTee's students even took the Illinois State Licensing Examination. Of that number only twelve percent passed.

LaTee's did succeed in enriching its owner, Willie J. Echols. Echols used LaTee's to defraud the U.S. government of financial aid funds. Students attending licensed and accredited beauty schools are eligible for federal financial aid. By falsifying loan application forms and student time records, Echols and his staff induced the government to issue financial aid checks to LaTee's students. They represented that students had near-perfect attendance records, when in fact many were barely attending. The staff at LaTee's encouraged students to overstate their financial need and at times entered false information on the students' loan applications. Students cashed their grant checks, when they arrived, at a nearby currency exchange. LaTee's staff called absent students to collect their checks at the school and then drove them to the currency exchange. At the exchange, Echols or some other staff member would take the school's "tuition" share and give the student the remainder. Echols' net worth increased from $136,000 to $527,000 from 1978 to 1984. He purchased three condominiums in the same period and acquired interests in several beauty salons.

The Department of Education began investigating LaTee's in 1981. In 1987 Echols and seven employees of LaTee's were indicted on various mail fraud, conspiracy and tax counts. Four defendants pled guilty pursuant to plea agreements. Echols proceeded to trial as did Sara Echols Johnson, Hugh "Dino" Bailey and Cynthia Johnson. Sara Johnson pled guilty during the eleven-day trial. Willie Echols was found guilty of mail fraud, conspiracy, filing false tax returns and making false declarations to a grand jury. Bailey was convicted on a conspiracy count.

Cynthia Johnson, the appellant here, had been charged with 29 counts of mail fraud pursuant to 18 U.S.C. § 1341 and one count of conspiracy to commit mail fraud pursuant to 18 U.S.C. § 371. Each mail fraud count related to a separate loan check. Johnson had been a student at LaTee's for a few months in 1981. Echols subsequently hired her to work in the main office. Johnson also became Echols' girlfriend. The jury found Johnson guilty on all counts. She was sentenced to prison for one year and one day and to five years of probation consecutive to the prison sentence.

On appeal Johnson alleges that the trial court erred in admitting one of Echols' statements against her. She also argues that the evidence, which focused mainly on Echols, was not sufficient to prove that she understood the fraudulent nature of the scheme. We conclude that the district court erroneously admitted Echols' statement. However, the error was harmless and the evidence sufficient to support the verdict. We affirm.

### I. Co–Conspirator Statement

Johnson contends that the trial court improperly admitted against her an exchange between Echols and James Shanks, a student at LaTee's. Shanks received his first grant check in September of 1980. After Echols accompanied Shanks to cash the

check at the currency exchange, the two went to a nearby bar. Shanks, who already owned a beauty shop, mentioned that he wanted to open a school in the future, because "that's where the money was." Tr. at 571. He said, "if you had like a hundred students and you charged them a thousand dollars apiece, that's clearing a hundred thousand dollars a year." *Id.* at 572. He also expressed an intention to use LaTee's as an example. Shanks characterized Echols' response as follows:

> Mr. Echols had told me that that wasn't a bad idea because of the fact that if you ever did anything wrong or you got caught doing anything, the only thing that you would have to say is that you didn't know that this was going on and you didn't know that you weren't supposed to do that because white folks didn't think niggers had enough sense to run a business anyway.

*Id.* Shanks repeated his testimony upon further questioning:

A. [T]he conversation was going to the effect that even if the students no longer came to school once they had applied or had filled out the grant forms, the grants were on their way. Even if the students didn't stay in school, the grant money was still coming.

Q. And what did Mr. Echols say in response to that statement?

A. That was when Mr. Echols had made the statement to the effect that * * * even if you had gotten caught or you did something wrong, all you had to do was play the nut role because niggers weren't supposed to have sense

enough to know how to run a business anyway.

Tr. at 581–582. Johnson's lawyer objected unsuccessfully to the admission of Echols' statement on the grounds that the statement did not qualify under Fed.R.Evid. 801(d)(2)(E), which requires that a co-conspirator statement be made "in furtherance of" the conspiracy. Johnson argues on appeal that the admission of the statement prejudiced her defense. Johnson claimed at trial that she never knew her acts were illegal. Johnson believes that the statement invited the jury to conclude that the conspirators agreed beforehand to feign ignorance if caught.

The statement was hearsay and must qualify under Rule 801(d)(2)(E) to be admitted against Johnson. The government introduced Echols' statement to prove the truth of the matter asserted, that Echols, and by implication his co-conspirators, intended to lie if questioned about LaTee's. The statement was properly admitted against Echols as his admission. However, Rule 801(d)(2)(E) precludes the introduction of a statement made by a co-conspirator against the defendant unless the statement was made "during the course and in furtherance of the conspiracy." *United States v. Doerr,* 886 F.2d 944, 950–951 (7th Cir.1989); Fed.R.Evid. 801(d)(2)(E).[1]

■ Echols' statement was improperly admitted against Johnson because it was not made "in furtherance of" the conspiracy.[2] Rule 801(d)(2)(E) is a *limitation* on the admissibility of co-conspirators' statements that is meant to be taken seriously." *Garlington v. O'Leary,* 879 F.2d 277, 283

---

**1.** Rule 801(d)(2)(E) also requires proof of the existence of the conspiracy and the defendant's participation in the conspiracy. All three elements must be proven by a preponderance of the evidence, and the co-conspirator's hearsay statements can themselves be considered in making these preliminary factual determinations. *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144. We review a district court's findings that the requirements of Rule 801(d)(2)(E) were met under a clearly erroneous standard. *United States v. Shoffner,* 826 F.2d 619, 627–628 (7th Cir.1987), certiorari denied, 484 U.S. 958, 108 S.Ct. 356, 98 L.Ed.2d 381. Johnson concedes that a conspiracy exist-

ed at the time Echols made his statement. As we discuss *infra* at 1003–1004, Johnson's participation in the conspiracy was also sufficiently proven.

**2.** The fact that Echols made his statement in 1980, before Johnson joined LaTee's in 1981, does not itself prevent the statement from being admitted against Johnson. Co-conspirator statements made before the defendant joins the conspiracy are nonetheless admissible against the defendant, provided that the statement is in furtherance of a conspiracy the defendant later joins. *United States v. Coe,* 718 F.2d 830, 839 (7th Cir.1983).

(7th Cir.1989) (emphasis in original). A co-conspirator statement satisfies the "in furtherance" requirement when the statement is "part of the information flow between conspirators intended to help each perform a role." *Id.* A statement in furtherance might, for example, recruit other conspirators, control damage to an ongoing conspiracy or keep conspirators advised about the progress of the conspiracy. *Id.*

■ Echols' statement to Shanks was not part of any "normal information flow between co-conspirators." *Doerr,* 886 F.2d at 952. Shanks was not a conspirator. Shanks had engaged Echols in casual conversation about Shanks' plans for the future. Echols was only commenting on Shanks' hypothetical business plan and did not intend by his remark to further any objectives of his own scheme. Mere "idle chatter," narrative declarations and superfluous casual remarks are not statements in furtherance of a conspiracy. *Id.* at 951. This is true even when, as here, the declarant makes what can be construed as an offhand admission of culpability. See *United States v. Posner,* 764 F.2d 1535, 1538 (11th Cir.1985) ("a letter that 'spilled the beans' regarding the tax scheme could hardly be considered to have advanced any object of the conspiracy"), certiorari denied, 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544; *United States v. Eubanks,* 591 F.2d 513, 520 (9th Cir.1979) (a "casual admission of culpability to someone [the declarant] had individually decided to trust" is not in furtherance of the conspiracy).

The government urges that Echols' statement be interpreted as an effort to gain Shanks' confidence and protect the conspiracy. The government's theory is that Echols' words were meant to keep Shanks from going to the authorities with his knowledge of how the grant checks were obtained and cashed. Given the context of the conversation, however, there is no reasonable basis for believing that Echols intended to induce Shanks to join a "conspir-

acy of silence." Shanks had not threatened to expose Echols' scheme in any way, nor had he expressed any concern about his observations of LaTee's. In these circumstances, it is improper to construe Echols' statement as in furtherance of the conspiracy. See *Posner,* 764 F.2d at 1538 (in the absence of evidence that recipients of letter had expressed suspicion, letter cannot be taken as attempt to allay suspicion).

■ The government also argues that once the statement became admissible against Echols as an indication of his state of mind, it became admissible against Johnson in spite of the fact that it did not satisfy the "in furtherance" requirement. It urges us to adopt the view that "if the statement being offered, although made out of court by a conspirator, does not constitute hearsay, *or satisfies another exception,* then the 'in furtherance' requirement does not have to be satisfied." 4 J. Weinstein & M. Berger, *Weinstein's Evidence,* § 801(d)(2)(E), at 242–243 (1987) (emphasis supplied). See also *United States v. Lieberman,* 637 F.2d 95, 103 (2nd Cir.1980) (though co-conspirator statement not in furtherance of conspiracy, it can be admitted against objecting defendant as statement against penal interest of declarant); *United States v. Paone,* 782 F.2d 386, 390–391 (2nd Cir.1986) (same), certiorari denied, 483 U.S. 1019, 107 S.Ct. 3261, 97 L.Ed.2d 761.[3]

We have never adopted an approach which would make Rule 801(d)(2)(E) a nonexclusive means of introducing a co-conspirator statement offered for its truth. See *Doerr,* 886 F.2d at 951, n. 5 (though statements can be admitted against declarants as their admissions, Rule 801(d)(2)(E) must be satisfied independently before statement is admissible against co-conspirator); *cf. United States v. Tuchow,* 768 F.2d 855, 869 (7th Cir.1985) (limiting instruction recommended even when co-conspirator statements not offered for truth but only to show nature and scope of conspiracy because such statements are not indepen-

---

**3.** The Second Circuit's view that a co-conspirator statement qualifying for any hearsay exception can be admitted against the defendant has not been adopted in the other circuits. This opinion thus does not create a conflict amongst the circuits.

dent evidence of defendant's participation in conspiracy). A rule allowing co-conspirator statements to be admitted whenever any hearsay exception is satisfied would undermine the purpose of Rule 801(d)(2)(E), which is to protect defendants in conspiracy trials from co-conspirator statements that by their nature are highly unreliable. Weinstein is critical of such an approach for just this reason in the passage following the excerpt the government quotes. *Weinstein's Evidence,* § 801(d)(2)(E), at 243–244 (*Lieberman* approach allows "many statements by a co-conspirator that do not satisfy the 'in furtherance' requirement to be re-analyzed as a declaration against penal interest * * * [but] does not discuss the rationale of the 'in furtherance' requirement, the question of inculpatory statements * * * or the Confrontation Clause"). See also *United States v. Pallais,* 921 F.2d 684, 688 (7th Cir.1990) (co-conspirator statements not in furtherance of conspiracy are "insufficiently reliable to be considered by a jury"). We decline to broaden the traditional hearsay rule which excludes a co-conspirator statement offered for its truth unless it is made in furtherance of the conspiracy.

Finally, the government claims the statement was admissible against Johnson because declarations of intentions are admissible against a nondeclarant when they are linked with independent evidence that corroborates the declaration. *United States v. Nersesian,* 824 F.2d 1294, 1325 (2nd Cir. 1987), certiorari denied, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382; *United States v. De Jesus,* 806 F.2d 31, 35 (2nd Cir.1986), certiorari denied, 479 U.S. 1090, 107 S.Ct. 1299, 94 L.Ed.2d 155. This rule admittedly ensures reliability better than the last urged upon us. However, whether such a rule ought to be adopted in this Circuit is a question we need not face, since in this case there is no corroborative evidence. Nothing in the statement itself refers to Johnson or suggests that Johnson also intended to "play the nut role" if questioned about LaTee's. The government intro-

duced no evidence which established that Johnson shared in Echols' specific plan to evade imprisonment.

■ We conclude that the district court committed clear error in allowing Echols' statement to be admitted against Johnson. Ideally Johnson should have received the limiting instruction she requested.

In this case, however, the wrongful admission of Echols' statement does not require a reversal of Johnson's conviction. Non-constitutional errors are governed by the harmless error standard of Fed.R. Crim.P. 52(a). "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Fed.R.Crim.P. 52(a). Other evidence of Johnson's guilt convinces us that the admission of Echols' statement had no substantial influence on the verdict against Johnson. See *United States v. Grier,* 866 F.2d 908, 920 (7th Cir.1989) (reversal not warranted if non-constitutional error had no substantial influence on the verdict).

At trial Johnson defended herself by arguing that she only followed Echols' orders and did not knowingly participate in the scheme to defraud the government. As part of a mail fraud case, the government must prove the defendant's own specific intent to defraud. *United States v. Cosentino,* 869 F.2d 301, 307–308 (7th Cir.1989), certiorari denied, 492 U.S. 908, 109 S.Ct. 3220, 106 L.Ed.2d 570. Johnson argues that evidence relevant to her state of mind was sparse. She believes that only the erroneous admission of Echols' statement convinced the jury of her guilt. According to Johnson, Echols' statement persuaded the jury that she was lying about her innocent mindset in conformance with Echols' plan.

The government presented substantial evidence, other than Echols' statement,[4] from which the jury might have concluded that Johnson understood the wrongfulness of her acts. The evidence showed that Johnson had worked in the main office

---

**4.** Even if considered alone, the statement does not implicate Johnson. Nothing contained in the statement itself suggests that Johnson

shared Echols' intent or that Johnson even knew of Echols' plan to feign ignorance.

since 1981. Students and co-workers testified that Johnson added hours to student timecards and forged students' signatures on those cards, though the students were supposed to fill in and sign their own records. The time cards were used primarily to obtain state accreditation, which was a prerequisite to the school's eligibility for participation in the federal loan program. Johnson told students that their time cards would be falsified to reflect attendance if they did not attend classes. Johnson also helped to complete the portions of federal loan application forms in which the school represented that students were regularly attending classes.[5]

Johnson was one of the staff members who rounded up students to collect their checks on the days the funds arrived. She phoned students who were absent to encourage them to get their checks. She drove them to the currency exchange. After the checks were cashed, Johnson, like Echols, would collect the "tuition" portion of the cash, leaving students with the rest. Students often saw Johnson carrying large sums of cash. Johnson once told a student that if he wanted a loan he would have to give her "something."

The jury could easily have found from the above evidence that Cynthia Johnson knew the scheme was illegal. She knew of the deliberate falsification of students' attendance records and the subsequent receipt of federal funds. She observed and participated in the highly irregular check cashing procedure.

Johnson's knowledge of the illegal nature of the scheme could also be inferred from the fact that Johnson herself received student loan checks after having essentially dropped out of LaTee's. From 1981 to 1984 she received seven federal financial aid checks, though she attended class sporadically after Echols hired her to work in the office. During this time, she also completed and signed several financial aid forms representing that she was attending classes.

None of the evidence against Johnson was direct. However, circumstantial evidence is sufficient to prove the defendant's participation in a conspiracy. *United States v. Redwine*, 715 F.2d 315 (7th Cir. 1983), certiorari denied, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367. The evidence produced at trial tended to show that Johnson could not have failed to understand that the sham operation at LaTee's defrauded the federal government. We cannot say, in the face of this evidence, that the introduction of Echols' statement substantially influenced the jury's verdict. Therefore the error will be deemed harmless.

## II. Sufficiency of Evidence

██ Johnson's second complaint, that the evidence produced at trial was insufficient to prove the requisite intent to commit mail fraud or participate in a conspiracy to commit mail fraud, is largely answered by the preceding discussion. The standard of review for a sufficiency inquiry is more favorable to the government than the harmless error analysis employed above.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560. Substantial evidence must support a jury finding that a defendant participated in a conspiracy. *United States v. Durrive*, 902 F.2d 1221, 1229 (7th Cir.1990). A review of all the evidence, construed in a light most favorable to the prosecution, supports affirmance of the verdict.

Only one additional point deserves mention. Johnson argues strenuously that because she was unsophisticated, she cannot be found to have the requisite intent to defraud the government or to participate in a conspiracy. Johnson cites two cases in

---

**5.** Johnson stipulated to a handwriting report introduced by the government. An expert found that eight Forms 304 (Requests for Pay- ment of Pell Grants) contained Johnson's handwriting.

support of her argument, *United States v. Bailey*, 859 F.2d 1265 (7th Cir.1988), certiorari denied, 488 U.S. 1010, 109 S.Ct. 796, 102 L.Ed.2d 787 and *United States v. Pearlstein*, 576 F.2d 531 (3rd Cir.1978). In each of these cases, the relative inexperience of the defendants, as compared to their alleged co-conspirators, in part convinced the appellate court that the defendants did not knowingly participate in a fraudulent scheme.

As we have discussed at length, the record provides ample evidence that Johnson did understand the fraudulent nature of her actions. *Bailey* and *Pearlstein* do not supply an unsophisticated defendant with an automatic defense to a fraud or conspiracy indictment. *Bailey* and *Pearlstein* only demonstrate that the evidence may prove that a defendant's lack of sophistication prevented him or her from forming the requisite intent. This is likely when the schemes involved are complex, and the defendant is significantly less knowledgeable than his or her alleged co-conspirators. There was no evidence in this case that these factors kept Johnson from understanding that her acts were illegal. In fact, it was never even established at trial that Johnson was unsophisticated. Johnson herself did not testify and only one witness commented that the students at LaTee's generally were not sophisticated.

The evidence at trial sufficed to support the jury verdict and the conclusion that Cynthia Johnson knowingly participated in a scheme to defraud the government. The evidence also was sufficient to overcome the effects of the erroneous introduction of Echols' statement. For these reasons, the conviction is valid.

AFFIRMED.