**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Clarence BROWN, Defendant–Appellant.**

**No. 89–2860.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 5, 1990.

Decided Aug. 21, 1991.

David E. Risley (argued), Springfield, Ill., for plaintiff-appellee.

Nathaniel R. Howse (argued), Chicago, Ill., for defendant-appellant.

Before COFFEY and KANNE, Circuit Judges, and GRANT, Senior District Judge.*

KANNE, Circuit Judge.

Clarence Brown was convicted of distributing cocaine and participating with George Russell, his brother-in-law, in a conspiracy to distribute cocaine. The events leading to Brown's arrest, as well as those of George Russell and Lavetta Russell (George's sister, Brown's common-law wife, and the mother of Brown's son), began in early 1988. On February 5, 1988, two Drug Enforcement Administration undercover agents purchased four ounces of cocaine, a test buy, from George Russell in a K-Mart parking lot in Springfield, Illinois. Two months later the same DEA agents purchased an additional kilogram of cocaine for $24,000 from Russell in the same K-Mart parking lot. After this second delivery, the agents began talking to Russell about arranging a ten-kilogram purchase of cocaine.

The DEA agents' planning and groundwork eventually paid off when Russell agreed to the ten-kilogram sale. On August 17, 1988, the agents and Russell engaged in five tape-recorded phone conversations discussing the details of the imminent transaction—the purchase price for the cocaine ($28,000 per kilogram), the terms and conditions of the drug sale, and the procedure the parties would follow in conducting their transaction later that evening. The agents placed all five telephone calls to Russell (some in response to his pages) at various locations. The first three calls were placed to a telephone located in the Chicago home of Lavetta Russell, although the phone number was registered to Mae Russell, a sister. The fourth call was made to a cellular phone while Russell and Brown were driving from Chicago to Springfield. And, the final telephone call was placed to a public telephone in a Hardee's parking lot in Springfield.

As a result of the phone conversations, it was agreed that the sale would take place that evening in the usual K-Mart parking lot. More importantly, Russell indicated in several of the conversations that he intended to have a partner drive him from Chicago to Springfield and take part in the transaction. Although he never identified the person by name, Russell repeatedly referred to this new person as his "partner," his "in-law," "a person working for me," a "relative," and as someone he could trust.

Shortly before midnight, Russell paged the undercover agents to signal his arrival in Springfield. After receiving Russell's page, the agents (according to their understanding with Russell) placed a call to a pay telephone near a Hardee's restaurant located just down the street from the K-Mart parking lot. Russell confirmed his location, and the agents told him that they would meet him there shortly. Russell then remained near the telephone booth to await the arrival of his "buyers."

Alerted to Russell's location, a surveillance agent positioned himself so he could observe Russell's actions. While Russell talked on the phone with the undercover agents, Brown was observed seated behind the wheel of a maroon Buick Riviera in the Hardee's parking lot. A few minutes later, Brown drove the car, with its headlights out, the short distance from the Hardee's to the K-Mart parking lot. Once in the parking lot, Brown made a U-turn, parked, and remained seated in the car.

The two undercover agents soon arrived at the Hardee's restaurant and approached Russell. After a brief conversation, the agents asked Russell if he had the cocaine with him. He responded negatively, but gestured across the street to the K-Mart parking lot, saying "[m]y partner's got it over there." At Russell's request, the agents then agreed to drive him across the street to the otherwise deserted parking lot. Once there, Russell instructed the DEA agents to pull up next to the Riviera. Bringing the car to a halt approximately 45

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

feet away from the Riviera, the undercover agents again asked Russell where the cocaine was located. And, once again, Russell stated "[i]t's over there, my partner's got it" and pointed at the Riviera in which Brown was seated.

Expressing some reluctance to involve an unknown person in their dealings, the drug enforcement agents asked Russell to get the cocaine from the Riviera. He complied with their request and retrieved a gym bag from the car where Brown was seated. Upon his return, Russell handed the bag to one of the agents, who opened it and observed a package of cocaine wrapped in fiberglass. With the short inspection completed, the undercover agents agreed to purchase the cocaine. The agents then told Russell that they had left the money across the street and needed to go pick it up. Although Russell was apparently willing to let them take the cocaine with them, the agents convinced him to keep the gym bag until their return. So, while the DEA agents went "to get their money," Russell returned to the Riviera and waited with Brown.

As the undercover agents left the parking lot, they gave a pre-arranged arrest signal to the surveillance agents. In response, government agents in several cars converged on the Riviera from the west and east sides of the parking lot. When the lead car approached the Riviera, its headlights, siren, and flashing red light were turned on. At this signal, the other task force cars did the same and fanned out surrounding Brown and Russell. And, in what one agent described as a split-second response, Brown stuck both hands out of the window to indicate his peaceable surrender to the authorities. Only after Brown had reacted did the agents identify themselves and order Brown and Russell

not to move. Shortly thereafter, both men were handcuffed and taken into custody.[1]

After the arrests were made, the DEA agents returned and searched the Riviera. The gym bag containing the one-kilogram package of cocaine was found on the front passenger seat of the car. In addition, the search recovered the cellular telephone that Russell had used to talk with the undercover agents while en route from Chicago.

A four-count indictment was returned against Brown, Russell, Lavetta Russell, and Amelia Figueroa. Brown's three co-defendants entered into plea agreements with the government prior to trial. Brown, however, did not, and his case subsequently proceeded to trial on two counts—conspiracy to distribute cocaine in violation of 21 U.S.C. § 846 and distribution of cocaine in violation of 21 U.S.C. § 841(a)(1)—of the indictment.

▉ At the beginning of the trial, Brown's attorney made a motion *in limine* to prevent the government's introduction of the tape-recorded telephone conversations between the undercover drug agents and Russell on the grounds that there was no proof *aliunde* (independent evidence) of Brown's connection to the conspiracy. After the government made an oral proffer of evidence demonstrating Russell's participation in the conspiracy, the district court ruled that the recordings were admissible as co-conspirator statements. Brown's case then proceeded to trial and the jury returned guilty verdicts on both counts. The district court then sentenced Brown to 78 months imprisonment on each count, with the sentences to be served concurrently.

Under the Federal Rules of Evidence, "[a] statement is not hearsay if ... [t]he statement is offered against a party and is

---

1. Needless to say, Brown's version of events differs from that of the government's witnesses. At trial, he testified that he had agreed to drive Russell to Springfield because he needed the $200 that Russell had promised to pay him. He also stated that he had no knowledge that the gym bag contained cocaine. His recollection of the events in Springfield also differed from that of the other participants. For example, he claimed he pulled into the K–Mart parking lot in order to relieve a "call of nature," although none of the surveillance agents observed him get out of the car. Finally, Brown maintained that he put his hands out the window only after being instructed to do so by the authorities. The jury was free to consider this competing testimony, but it returned a guilty verdict which suggests that it found the government's witnesses to be more credible than Brown.

... a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." FED.R.EVID. 801(d)(2)(E). To determine whether a statement was made by a "co-conspirator," of course, requires the trial court to make a factual determination, under the preponderance of the evidence standard, that the defendant against whom the evidence is being asserted actually joined the conspiracy. *See* FED.R.EVID. 104(a); *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987); *United States v. Cox*, 923 F.2d 519, 526 (7th Cir. 1991); *United States v. Martinez de Ortiz*, 907 F.2d 629, 631–32 (7th Cir.1990) (*en banc*), *cert. denied*, —— U.S. ——, 111 S.Ct. 684, 112 L.Ed.2d 676 (1991). On appeal, Brown's primary argument is that the district court erred when it permitted the jury to hear and consider Russell's tape-recorded, out-of-court statements. He maintains that the statements were inadmissible hearsay because the government presented no proof that he had participated in the conspiracy. We disagree.

"We review a district court's findings that the requirements of Rule 801(d)(2)(E) were met under a clearly erroneous standard." *United States v. Johnson*, 927 F.2d 999, 1001 n. 1 (7th Cir.1991) (citing *United States v. Shoffner*, 826 F.2d 619, 627–28 (7th Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987)). We begin by noting that independent evidence exists which supports the district court's determination that Brown was a member of the conspiracy.[2] For example, Brown's activities the night of his arrest—government agents observed him driving the car carrying the cocaine from the Hardee's restaurant to the empty K–Mart parking lot with the car's headlights out and sitting patiently in the car until Russell and the "buyers"

came to pick up the gym bag containing the cocaine—suggest that Brown knew he was involved in a drug sale and, accordingly, was taking precautions to avoid detection. Similarly, the fact that Russell was more cautious than usual that evening also supports the theory that someone else, in this case Brown, was involved in the planning of the drug transaction. Finally, while the expected reaction of someone without knowledge that a drug sale was occurring would be one of surprise or bewilderment at the unexpected appearance of government agents, the record reveals that Brown reflexively threw both hands out the window of the car as a signal of his peaceable surrender to the authorities when the authorities moved in to make the arrests. We recognize, of course, that this evidence need not be viewed as indicative of Brown's guilt. Undoubtedly, an innocent person might also raise his hands when surrounded by several squad cars with lights flashing, or might forget to turn on his car headlights while driving, or might sit in a dark, deserted parking lot late at night. But, in the context of a Rule 104 determination, the district court was free to consider and weigh this evidence.

Moreover, this circumstantial evidence was buttressed by Russell's tape-recorded phone conversations with the undercover agents.[3] As *Bourjaily* notes, even if out-of-court statements are presumptively unreliable, "a co-conspirator's statements [can] themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy." *Bourjaily*, 483 U.S. at 181, 107 S.Ct. at 2781; *see also Martinez de Ortiz*, 907 F.2d at 633. In this case, Russell's statements do substantiate Brown's knowledge of, and participation in, the conspiracy. For example, Russell had

---

2. We therefore need not address the question of whether a court can rely solely upon a co-conspirator's uncorroborated, out-of-court statements in deciding to admit the statements into evidence. *See Bourjaily*, 483 U.S. at 181, 107 S.Ct. at 2781 (noting this is open question); *Martinez de Ortiz*, 907 F.2d at 636–38 (dissent noting same) (Bauer, C.J., dissenting).

3. In *Bourjaily*, 483 U.S. at 181, 107 S.Ct. at 2781, the Court held that "a court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted." *See also Johnson*, 927 F.2d at 1001 n. 1; *Cox*, 923 F.2d at 526 n. 5. Brown's argument that the district court could not consider Russell's statements when making its Rule 104 determination is, therefore, clearly wrong.

stated that someone—an "in-law," a "relative," his "partner"—would drive him to Springfield with the cocaine. And, as the facts in the record demonstrate, Brown was Russell's brother-in-law and he did accompany Russell on his late-night trip from Chicago to Springfield. Russell's statement that his "partner's got it [the cocaine]" while pointing to the car in the parking lot indicates that Russell believed Brown to be a participant and also supports the conclusion that Brown was a participant in the conspiracy. Finally, although Russell had personally controlled the cocaine involved in the prior transactions, on this trip he left Brown alone in the car with the cocaine, further reinforcing the reliability of his statements that his "partner" was someone he could trust.[4] Thus, we conclude that the district court's decision to admit Russell's tape-recorded telephone conversations into evidence was not clearly erroneous.

◼ Brown also maintains that an error in the jury instructions requires the reversal of his convictions. When charging the jury, the district court followed the pattern instruction and stated that "[i]n determining whether the defendant became a member of the conspiracy you may consider only the acts and statements of the defendant." *Federal Criminal Jury Instructions of the Seventh Circuit* § 5.11 (1980). This instruction, Brown argues, was erroneous because the court failed to specifically instruct the members of the jury that they were not to consider Russell's out-of-court statements (the co-conspirator declarations) when determining whether Brown was a member of the conspiracy. In *Martinez de Ortiz*, we held that the instruction given the jury in this case was indeed erroneous because, in light of *Bourjaily* and Federal Rule of Evidence 104, the jury *was* entitled to consider the co-conspirator statements when determining a defendant's participation in a conspiracy. *Martinez de*

*Ortiz,* 907 F.2d at 633–34; *see also United States v. Romo,* 914 F.2d 889, 893 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1078, 112 L.Ed.2d 1183 (1991); *United States v. Caliendo,* 910 F.2d 429, 433 (7th Cir.1990). While the jury instruction in question was an incorrect statement of the law, the error here worked to Brown's advantage by preventing the jury from considering incriminating evidence of Brown's involvement in the conspiracy. Accordingly, there is no need for a new trial.

◼ Finally, to the extent that Brown argues there was insufficient evidence to support his conviction, we disagree. The evidence in this case—the co-conspirator statements and the circumstantial evidence of Brown's involvement in the conspiracy—was not overwhelming. But it was more than substantial and thus more than enough to allow a rational juror to conclude that Brown had participated in the conspiracy. *See, e.g., Martinez de Ortiz,* 907 F.2d at 635–36; *United States v. Durrive,* 902 F.2d 1221, 1225–29 (7th Cir.1990).

For the foregoing reasons, the conviction of Clarence Brown on both counts is AF-FIRMED.

---

**4.** The transcripts of the tape-recorded phone conversations provide further proof that Russell's "partner" and "relative" was, indeed, someone he believed he could trust. Russell originally planned to fly down to Springfield while his "partner" would bring the cocaine from Chicago in a car. Russell finally agreed to bring the

cocaine to Springfield himself only after his "buyers" told him they were uneasy with involving a third party in the deal. In addition, Russell's original plans called for this person to take the money from the sale back to Russell's supplier in Chicago that same evening.