**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jeffrey Paul CURTIS, Defendant–
Appellant.**

No. 93–3447.

United States Court of Appeals,
Seventh Circuit.

Argued May 9, 1994.

Decided Sept. 29, 1994.

302

K. Tate Chambers, Bradley W. Murphy, Asst. U.S. Attys., Peoria, IL, for plaintiff-appellee.

Peter B. Keller, Keller & Hall, Tucson, AZ (argued), for defendant-appellant.

Before MESKILL,* FLAUM, and MANION, Circuit Judges.

FLAUM, Circuit Judge.

Jeffrey Paul Curtis was sentenced to 262 months imprisonment after a jury found him guilty of conspiracy to distribute marijuana and acquitted him of a companion charge of money laundering. On appeal, Curtis raises four arguments: (1) that the district court erred in admitting hearsay statements of a co-conspirator; (2) that the evidence presented at trial was insufficient to prove a single conspiracy; (3) that the court erred in imposing a sentence enhancement for obstruction of justice; and (4) that the court erred in denying a reduction for acceptance of responsibility. We affirm.

I.

In May 1992, Curtis and four others were charged with conspiracy to distribute marijuana between 1982 and 1988 and money laundering. Two of the defendants were alleged to have been involved as distributors throughout the period while the other three were thought to have participated as successive suppliers. Three of the defendants entered into plea agreements, and in January 1993, the district court granted Curtis' pretrial motion to sever his trial from that of the remaining co-defendant, Martin Sax, whom the government contended was the original supplier. The government then sought and obtained a new indictment against Curtis in February 1993, charging the same two violations but limiting the dates of the alleged conspiracy to the years in which Curtis was the supplier.

Curtis remained out of custody while awaiting trial on the original indictment and appeared in Peoria for arraignment on the new indictment on March 15, 1993. At that time the court scheduled a further hearing for March 18 to discuss the conditions of release. Curtis failed to appear in Peoria as directed on the 18th; instead he turned himself in that day to the United States Marshal in Tucson, Arizona. On account of Curtis' disobedience, the court ordered him to remain in custody throughout trial and sentencing.

At trial the government called several witnesses who testified that Curtis had supplied substantial amounts of marijuana to two major Illinois distributors, Mike Cutkomp and Joe Cullinane, from 1986 to 1989. The government's key witnesses were Cullinane himself and Mike Cutkomp's former wife, Karen. Cullinane testified that Cutkomp had introduced him to Curtis and helped facilitate their initial transaction in 1986. For some time thereafter Cullinane used his own couriers to transport the marijuana from Arizona to Illinois, but later received his deliveries from Curtis' trucks. Cullinane asserted that after the initial transaction, his arrangements with Curtis were conducted separately from Cutkomp's and that the two Illinois dealers did not consider themselves to be partners. One of Cullinane's couriers, Ron Witt, testified that he had driven several truck-loads of marijuana supplied by Curtis for distribution in Illinois. Witt was aware that Curtis was supplying marijuana to both Cullinane and Cutkomp.

At trial Karen Cutkomp testified to statements made to her by her husband during the course of the alleged conspiracy. Curtis objected to the admission of these statements, which he contended were not made in furtherance of the conspiracy, but the court overruled the objection and allowed the testimony. Karen Cutkomp also testified that while she and her then-husband were en route to Mexico (attempting to remain a step ahead of law enforcement authorities) they met with Curtis in Tucson and turned over to

* The Honorable Thomas J. Meskill of the United States Court of Appeals for the Second Circuit is sitting by designation.

him approximately $225,000 in marijuana proceeds that Curtis later delivered to a man in Nogales, Arizona, according to their instructions. In addition, Karen Cutkomp's mother, Rosina Jech, testified that she had served as a drug courier between Tucson and the Quad Cities area and had been introduced to Curtis in Tucson through Mike Cutkomp.

Curtis neither testified nor presented witnesses on his own behalf. He did, however, make a statement to investigators on December 13, 1990. At that time, Curtis admitted that Marty Sax had introduced him to Mike Cutkomp and that he knew that Cutkomp was a fugitive. Curtis denied having any correspondence or business dealings with Cutkomp, though he recalled meeting Rosina Jech and Joe Cullinane and stated that his business had access to trucks. Curtis' trial strategy relied on two principal arguments. First, he hoped that the jury would discount the testimony of the key witnesses against him on the basis of their own criminal conduct and a perception that their credibility might be tainted by their obvious incentive to curry favor with the prosecution. Second, he argued that the government had proven two separate conspiracies (Curtis–Cutkomp and Curtis–Cullinane) rather than one all-encompassing conspiracy (Curits–Cutkomp–Cullinane).

At the jury instruction conference, Curtis successfully argued for the inclusion of Defendant's Instruction No. 1, which stated:

Proof of several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment unless one of the several conspiracies which is proved is the single conspiracy which the indictment charges. What you must do is determine whether the conspiracy charged in the indictment existed between two or more persons. If you find that no such conspiracy existed, then you must acquit. However, if you are satisfied that such a conspiracy existed, you must determine who were the members of that conspiracy.

To find the defendant guilty, you must find that he was a member of the conspiracy charged in the indictment.

The jury returned a verdict of guilty on the conspiracy to distribute marijuana charge, and a verdict of not guilty on the money laundering charge.

At sentencing, the court imposed a two-level upward adjustment for obstruction of justice, U.S.S.G. § 3C1.1, and denied Curtis' request for a two-level reduction for acceptance of responsibility. U.S.S.G. § 3E1.1. The court sentenced Curtis to 262 months imprisonment, the lowest possible sentence within the applicable guideline range.

## II.

### A.

We turn first to Curtis' argument that an impermissible variance existed between the indictment and the proof at trial. Specifically, Curtis contends that while a rational jury may have concluded that he had supplied a large quantity of marijuana to both Cullinane and Cutkomp, there was insufficient evidence to link all three in a single conspiracy. Drawing upon this court's decisions in *United States v. Townsend*, 924 F.2d 1385 (7th Cir.1991) and *United States v. Napue*, 834 F.2d 1311 (7th Cir.1987), Curtis maintains that no single overarching scheme existed because his arrangement with Cullinane was separate from and not in any way dependent upon the agreement he made with Cutkomp. In response, the government asserts that Cullinane and Cutkomp had acted in concert long before Curtis became their supplier and continued to receive joint shipments from Arizona at various points during the purported Curtis–Cullinane–Cutkomp conspiracy. Moreover, the government suggests that several additional pieces of evidence—the number of long distance telephone calls between the three parties, the size of the marijuana shipments (on occasion over 1,000 pounds) and the fact that Cullinane absorbed an entire shipment after Cutkomp fled to Mexico as a favor to Curtis—give rise to an inference of mutual support and dependence. Curtis responds that the permissible inferences to be drawn from the evidence extend no further than that Cullinane and Cutkomp knew each other, talked on the phone, and

had the same type of business relationship with Curtis.

■ A defendant asserting a claim of variance will succeed in obtaining reversal of his conviction only if he establishes that (1) the evidence presented at trial was insufficient to support the jury's finding of a single conspiracy, and (2) he was prejudiced by the variance. *See United States v. Testa*, 33 F.3d 747, 750 (7th Cir.1994); *Townsend*, 924 F.2d at 1390; *see also* Fed.R.Crim.P. 52(a). We have stated on numerous occasions that the jury gets "first crack" at deciding "whether there is one conspiracy or several when the possibility of a variance occurs," *see e.g., United States v. Nava–Salazar*, 30 F.3d 788, 796 (7th Cir.1994); *United States v. Paiz*, 905 F.2d 1014, 1019 (7th Cir.1990), *cert. denied*, 499 U.S. 924, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991), because a question of variance is a question of fact within the jury's realm of expertise. *Paiz*, 905 F.2d at 1019. Where, as here, the parties argued and the jury was instructed as to the dispute concerning the number of possible conspiracies, our initial inquiry simply becomes one of the sufficiency of the evidence. Thus, we view the evidence most favorably to the government, and we uphold a jury's factual conclusion that a single conspiracy existed if *any* rational trier of fact could have found, beyond a reasonable doubt, the one conspiracy. *United States v. Emenogha*, 1 F.3d 473, 480 (7th Cir.1993) (citations omitted). Finally, even if we do not find sufficient evidence of a single conspiracy, the variance will be fatal to the government's case only if the defendant can demonstrate prejudice. *Townsend*, 924 F.2d at 1410. This additional requirement reflects the understanding that "[t]he crime of conspiracy focuses on agreements, not groups;" accordingly, the government "need only prove that the defendant joined the agreement alleged," and need not establish the group of coconspirators with whom the defendant joined. *See Testa*, 33 F.3d at 750 (citing *Townsend*, 924 F.2d at 1389).

In this case, the government does not present strong direct evidence of a common scheme or agreement involving all three men—for example, evidence showing that Cullinane and Cutkomp drew support from or depended in some way upon the success of each other's distribution networks. However, as we have noted previously, we need not limit our search to *direct* evidence. *Townsend*, 924 F.2d at 1390; *United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir.1990). The "elastic and sprawling" nature of drug (and other) conspiracies, *see Krulewitch v. United States*, 336 U.S. 440, 445, 69 S.Ct. 716, 719, 93 L.Ed. 790 (1949) (Jackson, J., concurring), often requires juries to sort, weigh, and draw conclusions from circumstantial evidence and limits the likelihood that a "smoking gun" will be found that implicates all who have been charged. In these circumstances, the critical question becomes "whether the jury may reasonably *infer* a single agreement among the defendants from the evidence of the drug transactions presented by the government." *Townsend*, 924 F.2d at 1390.

■ We agree with Curtis that the evidence arguably establishes multiple conspiracies, but we may not find a variance unless *no* reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment. Here we are persuaded that the circumstantial evidence, though relatively weak in its component parts, was sufficient to permit an inference of a single overarching agreement when viewed cumulatively. Examining the evidence in the light most favorable to the government, as we must, we believe that the jury could have found a unitary Cullinane/Cutkomp/Curtis conspiracy on the basis of the evidence presented about the genesis and evolution of the drug distribution network. Cullinane and Cutkomp had a long relationship of conspiring to distribute marijuana that was marred by an inconsistent supply. Cutkomp was the first to discover Curtis as a potentially stable source, and, satisfied with his performance, recommended Curtis to Cullinane. Furthermore, Cutkomp introduced Cullinane to Curtis in Tucson and even helped package and load the initial quantity of marijuana sold by Curtis to Cullinane. Thereafter the three men remained in contact (as evidenced by the phone records) and Curtis ordinarily sent single trucks from Arizona to make two de-

liveries, one to Cutkomp in the Quad Cities and the other to Cullinane in the Chicago area. After Cutkomp fled to Mexico, however, Cullinane received full loads for a short time (because half was no longer being unloaded in the Quad Cities), but he soon terminated the arrangement because undertaking to resell full loads caused him to bear too much risk. Thus, the jury could have inferred that the enterprise collapsed once Cutkomp could no longer participate. Though the sum of this evidence does not produce the most compelling case for the existence of a single overarching conspiracy, we conclude that it crosses the rather low threshold that it must to withstand appellate review.

Even if we were to assume that no rational jury could have found a single conspiracy as alleged in the indictment, the resulting variance would have been harmless error as it would not have unfairly denied Curtis of a fair trial and sentencing. As we have observed on several occasions, the Supreme Court has looked to the following factors to determine whether prejudice has resulted from a variance between indictment and proof: (1) surprise to the defendant resulting from the variance, (2) possibility of subsequent prosecution for the same offense, (3) likelihood of jury confusion as measured by the number of conspirators charged and the number of separate conspiracies proven, and (4) likelihood of jury confusion in light of the instructions giving the jury limiting or excluding the use of certain evidence not relating to a particular defendant. *See, e.g., Townsend,* 924 F.2d at 1410–11; *United States v. Lindsey,* 602 F.2d 785, 787–88 (7th Cir.1979). To this list we have added the possibility of prejudice arising from introduction of co-conspirator hearsay evidence and from an enhanced sentence computed on the basis of the drug-related activities of others with whom the defendant did not conspire. *United States v. Aquilla,* 976 F.2d 1044, 1052 (7th Cir.1992); *Townsend,* 924 F.2d at 1412. At the same time, however, we have noted that the need to precisely distinguish between a single conspiracy and multiple conspiracies diminishes considerably where, as here, the defendant is the common link between the alleged coconspirators. *See Unit-*

*ed States v. Flood,* 965 F.2d 505, 509 (7th Cir.1992); *United States v. Noble,* 754 F.2d 1324, 1330 (7th Cir.), *cert. denied,* 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985); *see also United States v. Johnson,* 32 F.3d 265, 268 (7th Cir.1994) ("There is little, if any, need for a multiple conspiracy instruction when the defendants are at the hub of the various possible agreements."); *Napue,* 834 F.2d at 1333 ("Even if there were two conspiracies, [where the defendant is the hub of these conspiracies] it is usually not necessary to explore the ways in which the plan might be recast as a series of more limited agreements.").

■ Applying these principles to the facts of this case, there could be no prejudice. Curtis was the only person on trial, thus eliminating the customary concern with jury confusion resulting from the "spillover" effect associated with simultaneously trying multiple defendants with various connections to the purported scheme. In addition, the evidence clearly demonstrated that Curtis operated as the common supplier to both Cullinane and Cutkomp throughout the time period charged in the indictment. As we explained in *Flood,* this evidence, placing Curtis at the hub of the conspiracy, means that his actions are viewed in a different light than those of his confederates. Though Cullinane or Cutkomp might plausibly have argued that *they* "lacked knowledge of the reach or likely reach of the conspiratorial network," *Flood,* 965 F.2d at 509 (citing *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)), Curtis surely knew all of the important details—to whom he was selling and in what amounts—and he therefore was not prejudiced by the admission of statements made by his coconspirators or by having his sentence calculated according to the quantity he sold to both Cullinane and Cutkomp.

### B.

Curtis next argues that the district court improperly admitted into evidence, pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence, testimony of Karen Cutkomp relating to conversations she had with her hus-

band during the course of the alleged conspiracy. Curtis objected to this testimony both before and during trial, and the court granted a continuing objection after overruling two specific objections during the government's direct examination.

 Statements by a co-conspirator may be introduced against other conspirators if the government demonstrates that: (1) a conspiracy existed; (2) the defendant and the declarant were members thereof; and (3) the offered statement was made during the course of and in furtherance of the conspiracy. *United States v. Robinson,* 956 F.2d 1388, 1394 (7th Cir.1992) (citations omitted). We review a district court's findings with respect to these elements for clear error. *Id.* This means that we will not disturb the trial court's ruling if a reasonable basis exists for concluding that the statements furthered the conspiracy, even if an alternative explanation is equally plausible. *See Garlington v. O'Leary,* 879 F.2d 277, 284 (7th Cir.1989); *United States v. Molinaro,* 877 F.2d 1341, 1345 (7th Cir.1989).

Curtis appears not to contest the first two prongs of the inquiry; rather he insists simply that Karen Cutkomp's statements did not satisfy the "in furtherance" requirement. In *United States v. Johnson,* we stated that Rule 801(d)(2)(E) is a *"limitation* on the admissibility of co-conspirators statements that is meant to be taken seriously." 927 F.2d 999, 1001 (7th Cir.1991) (citing *Garlington,* 879 F.2d at 283). We explained further that the "in furtherance" requirement would be satisfied where the statement is "part of the information flow between conspirators intended to help each perform a role," and provided as examples statements made to "recruit other conspirators, control damage to an ongoing conspiracy or keep conspirators advised about the progress of the conspiracy." *Johnson,* 927 F.2d at 1002. At the other end of the spectrum, we noted that "mere idle chatter, narrative declarations, and superfluous casual remarks" do not constitute statements "in furtherance" of a conspiracy. *Id.*

 Curtis calls our attention to a particular exchange during his counsel's cross-examination of Karen Cutkomp that, he suggests,

belies the notion that Mike Cutkomp's statements to Karen Cutkomp were made "in furtherance" of the conspiracy. The dialogue went as follows:

Q. Now, when—there's a number of times you've testified on direct that Mike would talk to somebody and then tell you what happened?

A. Yes.

Q. Was that kind of on the order of if Mike had had a regular, you know, 9:00 to 5:00 straight job, a guy would come home and tell his wife what happened at work today?

A. Mike would.

Q. Yeah. I mean those conversations with you were on like that. Right?

A. Yes.

Q. They weren't necessary to keep the marijuana conspiracy going?

A. No.

Q. It was just him letting you know what was going on?

A. Yes.

Q. And it wasn't like you were going to, it wasn't like he was asking you for—to help him in the marijuana business by telling you these things?

A. No.

Q. All right. And the only time he sought your advice, he ignored it, the deal about the $60,000 with Rick Snider?

A. He was good at asking my opinion and then not using it.

Q. So it's not like he was using you as his consigliere to find out how he should do things in the marijuana business?

A. Call it sounding board, is all.

Q. Just a guy coming home and talking to his wife about what's going on in the business?

A. Yes.

Trial Tr. 5/4/93, pp. 114–115. The witness' own general characterizations of the nature of her testimony, however, cannot obscure the more specific details of her direct examination that indicate a greater import to the statements at issue. For example, in view of the fact that Karen Cutkomp's mother trans-

ported the marijuana from Arizona to the Quad Cities on numerous occasions, we find it likely that Mike Cutkomp's statements to Karen about the transportation arrangements were not merely dinnertime conversation between husband and wife, but rather were made to relate the need for Karen's mother to remain involved in the conspiracy. Likewise, Mike Cutkomp's statements to his wife about the substance of telephone calls he had made from Mexico to Curtis most likely were made to advise her of the extent to which law enforcement authorities appeared to have caught wind of the conspiracy and of the likelihood of their being able to return to the Quad Cities, or the United States generally. Curtis does not protest any other specific statements, though both at trial and appeal he registered his general objection to the entire line of inquiry. Based on our review of the record, we cannot conclude that the district judge committed clear error in admitting Karen Cutkomp's testimony in its entirety, and accordingly we do not disturb his rulings.

### C.

With respect to sentencing, Curtis first appeals the district court's decision to apply a two-level enhancement to his base offense level for obstruction of justice. U.S.S.G. § 3C1.1. We review this determination for clear error, *United States v. Brown*, 944 F.2d 1377, 1379 (7th Cir.1991), meaning that we will reverse only if we reach a "firm and definite conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *United States v. Herrera*, 878 F.2d 997, 1000 (7th Cir.1989).

U.S.S.G. § 3C1.1 states in its entirety:

If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by two levels.

As the Application Notes explain, this enhancement applies to "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial pro-

ceeding, ... or attempting to do so," Note 3(d), and to "willfully failing to appear, as ordered, for a judicial proceeding." Note 3(e). Furthermore, under § 3C1.1, "the defendant is accountable for his own conduct and for conduct that he aided or abetted, counseled, commanded, induced, procured, or willfully caused." Note 7.

■ In this case, the only relevant conduct giving rise to the enhancement was Curtis' role in receiving from the Cutkomps approximately $225,000 in drug proceeds, temporarily concealing that money, and later releasing the funds to a courier in Nogales, Arizona, pursuant to directions from the Cutkomps. In *Brown*, we upheld an enhancement for obstruction of justice where the defendant himself turned over the proceeds of marijuana sales to another person "for safekeeping" after the defendant became aware that he was the subject of a criminal investigation. 944 F.2d at 1383. Curtis argued, and the district court agreed, *see* Sent. Tr. at 81, that *Brown* was silent as to whether the person who *received* the money also qualifies for the enhancement. However, explicitly relying on Application Note 7, the court found that Curtis accountable for obstruction of justice on an aiding and abetting theory. On appeal, Curtis states that he often received large payments from Cullinane and Cutkomp and suggests that the receipt of the $225,000 was "as likely to be simply another act in furtherance of the conspiracy and *not* an act designed to conceal its existence." This argument is not persuasive. Even if we accept that Curtis frequently received large sums of cash from his co-conspirators, as payment for marijuana, this does not explain why Curtis subsequently turned the money over to a third party at a location along the U.S.–Mexico border for return to the purported purchaser. The much more likely conclusion, and the one drawn by the district court, is that Curtis knew that the Cutkomps were "on the lam." In these circumstances, we find the enhancement for obstruction of justice to be appropriate.

### D.

Curtis also contends that the district court erred in denying Curtis' request for a two-

level reduction for acceptance of responsibility. U.S.S.G. § 3E1.1. Because this issue presents a factual question, depending largely on credibility assessments of the sentencing judge, we give great deference to the district court's reasoned conclusion and reverse only for clear error. *See United States v. Guadagno*, 970 F.2d 214, 224 (7th Cir. 1992); U.S.S.G. § 3E1.1 Application Note 5.

■ Under § 3E1.1, a defendant is entitled to a reduction of his sentencing exposure only if he "clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." *United States v. Rivero*, 993 F.2d 620, 622–623 (7th Cir.1993). As the Commentary and Application Notes make clear, only in "rare situations" may a defendant clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. *See* Application Note 2. We have noted that the "rare situation" envisioned by the Sentencing Commission involves a defendant who concedes his factual guilt (i.e. that he has engaged in the charged conduct) before trial, but challenges the general content or specific application of a statute. *See Rivero*, 993 F.2d at 624; *Guadagno*, 970 F.2d at 226.

The district court relied on several factors in determining that Curtis had not accepted responsibility for his criminal conduct: (1) Curtis chose to go to trial rather than pleading guilty (at least to Count I); (2) Curtis violated the conditions of his pre-trial release by failing to appear at a scheduled court appearance and by having contact with his one-time co-defendant, Martin Sax; and (3) its determination that Curtis had obstructed justice, a finding that except in extraordinary cases, *see* U.S.S.G. § 3E1.1 Application Note 4, indicates that a defendant has not accepted responsibility. Sent. Tr. at 75–77. Curtis contests each of the rationales for the district court's conclusion. He posits first that the jury's verdict of acquittal vindicated his decision to go to trial on Count II. The decision to go to trial on Count I, he insists, did not represent a denial of guilt; rather he simply wished to preserve a technical legal issue— whether the conduct to which he admitted constituted one or two conspiracies—while

conceding that he committed the acts for which he stood accused. With respect to the failure to appear, Curtis suggests that his actions did not evidence an avoidance of responsibility so much as they reflected an avoidance of Peoria. In essence, Curtis asks us to view his unilateral decision to turn himself in to authorities in Tucson as irrelevant to the applicability of § 3E1.1. Finally, Curtis argues that the unique facts of this case—the behavior giving rise to the obstruction penalty occurred long before the indictment and Curtis admitted his involvement in a timely fashion relative to the date of his indictment—present one of the rare circumstances in which a reduction for acceptance of responsibility may be reconciled with an enhancement for obstruction of justice.

■ Like the district court, *see* Sent. Tr. at 75, we find Curtis' arguments interesting, though ultimately unpersuasive. The Sentencing Guidelines explicitly state that the acceptance of responsibility reduction is available only in "rare" or "extraordinary" circumstances if a defendant either puts the government to its burden of proof at trial *or* is determined to have obstructed justice. *See* U.S.S.G. § 3E1.1 Application Notes 2 and 4. Accordingly, a defendant like Curtis, who has both gone to trial *and* obstructed justice, must overcome quite a strong presumption to convince a court that he still is entitled to a reduction for acceptance of responsibility. We conclude that he has not done so. Curtis went to trial on Count I not to contest the constitutionality or applicability of a statute, but rather because he thought there was a variance between the indictment and the proof. We have characterized a variance as a challenge to the sufficiency of the evidence, *see Testa*, 33 F.3d at 750, and we find no indication, either in the Guidelines themselves or in the case law, that this type of claim falls within the "rare situations" exception contemplated in Application Note 2. We also believe that Curtis' violations of the conditions of his pre-trial release and his failure to appear at a hearing after receiving notice thereof reflect negatively on the extent of Curtis' acceptance of responsibility for his criminal conduct and affirmatively demonstrate the limits of his rehabilitative

efforts. The district court appropriately considered these transgressions and the circumstances surrounding Curtis' decision to go to trial on Count I in concluding that Curtis was not entitled to a reduction under § 3E1.1.

## III.

For the foregoing reasons, we affirm Curtis' conviction and sentence.

AFFIRMED.