UNITED STATES of America,
Plaintiff–Appellee,

v.

Paul W. GRAFFIA and Lion Bernard,
Defendants–Appellants.

Nos. 96–3725, 96–3765.

United States Court of Appeals,
Seventh Circuit.

Argued May 20, 1997.

Decided July 22, 1997.

Danile S. Reinberg (argued), Office of the United States Attorney, Barry Rand Elden, Chief of Appeals, Office of the United States Attorney, Criminal Appellate Division, Chicago, ILL, for Plaintiff–Appellee.

Michael D. Robbins, Gregory J. Schlesinger (argued), Chicago, IL, for Paul W. Graffia, Defendant–Appellant.

Gregory J. Schlesinger (argued), Schlesinger & Krasny, Chicago, IL, for Lion Bernard, Defendant–Appellant.

Before CUMMINGS, FLAUM and EVANS, Circuit Judges.

CUMMINGS, Circuit Judge.

On June 30, 1994, the grand jury returned a 16–count superseding indictment against defendants Paul W. Graffia, who lived in Illinois, and Lion Bernard, who lived in California, and two co-defendants, Roberto L. Ferrera and Jon Binette, relating to certain fraudulent schemes undertaken by the defendants in the Northern District of Illinois and elsewhere. Graffia was charged with conspiracy to commit wire fraud (Count One), four counts of wire fraud (Counts Two through Five), two counts of counterfeiting foreign securities (Counts Six and Seven), one count of filing a false income tax return (Count Nine), one count of failing to file an income tax return (Count Ten), and six counts of money laundering (Counts Eleven through Sixteen). Bernard was charged with one count of conspiracy to commit wire fraud (Count One), fours counts of wire fraud (Counts Two through Five), two counts of counterfeiting foreign securities (Counts Six and Seven), and one count of money laundering (Count Eleven). Graffia, Bernard and Binette were scheduled to stand trial beginning on April 1, 1996, with the tax return Counts severed from the trial. However, on that day, Binette became a fugitive. As a result, the district court issued a bench warrant for Binette's arrest and continued the trial until April 8, 1996.

On April 5, 1996, the district court severed Binette from Graffia's and Bernard's trial and dismissed Counts Five, Six and Seven of the superseding indictment as to Graffia and Bernard, all of which related to a scheme to defraud involving the printing and marketing of $11 billion of promissory notes that fraudulently purported to be guaranteed by the Mexican government. The court also struck all references to the fraudulent Mexican promissory notes in Counts One, Three and Four of the superseding indictment as to Graffia and Bernard.

On April 19, 1996, the jury returned guilty verdicts. Graffia was sentenced to 64 months' imprisonment and Bernard to 57 months' imprisonment.

The defendants make several challenges regarding the proceedings in the district court. First, they claim that the district court's April 5, 1996, order dismissing certain Counts of the superseding indictment and striking all references to a scheme to defraud involving the fraudulent Mexican promissory notes violated the Fifth Amendment because the narrowed charges were not resubmitted to the grand jury. Second, defendants assert that the district court improperly restricted the scope of their cross-examination of certain government witnesses. Finally, defendants contend that the district court erred in giving the jury an "ostrich instruction."

We affirm.

I.

The crimes of which Graffia and Bernard were convicted stemmed from three schemes to defraud that were carried out in 1990 and 1991. In the first two fraudulent schemes, the defendants used certain corporate shells—American Credit Corporation ("ACC") and Union International Bank & Trust, Ltd. ("UIBT")—and promised Raymond Patrick and Gerald Green that they would obtain loans for them to finance certain real estate projects. Graffia and Bernard charged Patrick and Green fees ($480,-000 and $125,000, respectively) to obtain these loans. After obtaining the fees, Graffia and Bernard did not provide the loans to

Patrick and Green, nor did they return the fees.

In the first scheme, Patrick, who was in the construction business, had an opportunity to build a hotel and casino in Las Vegas, Nevada. He signed a lease agreement with United Gaming, Inc., pursuant to which he agreed to build the hotel and casino and lease it to a subsidiary of United Gaming. In order to fulfill his obligations under the lease, Patrick needed to obtain financing to build the hotel, which he estimated to be approximately $32 million. United Gaming agreed to give Patrick until 5:00 p.m. on August 24, 1990, to obtain the financing, and in exchange Patrick transferred his interest in the land that he had purchased to build the hotel to a subsidiary of United Gaming (which in turn gave him an option to repurchase if he got the financing in time).

Patrick, through a couple of people who acted as loan intermediaries, received two draft commitment letters from ACC for a loan. The second commitment letter proposed that ACC would lend $48 million, with a commitment fee of $480,000 payable directly to ACC upon issuance of the commitment. Notwithstanding an agreement between the parties that the $480,000 would be placed in escrow pending an endorsement from Dai–Ichi Bank, after the parties signed the commitment letter Bernard and Graffia insisted that the commitment fee not be placed in escrow. Both defendants told Patrick that ACC needed the $480,000 to purchase the endorsement from Dai–Ichi Bank. They gave Patrick the purported telephone number of the branch of Dai–Ichi Bank in Vancouver, Canada and told him to speak to Mr. Hazlewood, who was handling the endorsement. Hazlewood assured Patrick that the bank was ready to provide the endorsement once it received the $480,000 commitment fee. (Unknown to Patrick, Hazlewood was not affiliated in any way with DaiIchi Bank.) After much pressure from the defendants and following that phone call, Patrick paid the $480,000 directly to ACC. Patrick never received a binding endorsement from Dai–Ichi Bank nor did ACC fund the $48 million loan by 5:00 p.m. on August 24, 1990, as promised by Bernard and Graffia. What Patrick received on August 24 was a worthless letter purporting to be a valid bank endorsement issued by co-defendant Binette on behalf of UIBT. When Patrick attempted to contact Binette by telephone and facsimile using the numbers on the purported endorsement from UIBT, he received no answer. Finally, Patrick realized he had been defrauded, and he went to the FBI in September 1990.

The Green scheme involves a similar tale of fraudulent activity. Gerald Green is a movie producer who had plans to build a resort in Ixtapa, Mexico. In early 1990, Green began looking for $12.5 million in financing for the first phase of the project. Like Patrick, Green was put in touch with Graffia and Bernard through several intermediaries. After several meetings with the defendants and after receiving fraudulent financial information regarding ACC, Green entered into an agreement with ACC whereby ACC was obligated to fund a $12.5 million loan within ten working days of execution of the agreement and deposit of a commitment fee of $125,000 into a trust account. The agreement provided that the commitment fee would be placed in trust and that it would not be released from the trust account until Green received an endorsement by Dai–Ichi Bank. As in the Patrick transaction, Green was pressured by Graffia and Bernard to pay the $125,000 directly to ACC prior to receiving the endorsement. Like Patrick, Green was told that the fee was required in advance to pay Dai–Ichi Bank's fee for the endorsement. Green caved in to such pressure after he saw a letter that purported to be from Dai–Ichi Bank, which was to the effect that ACC was a client of the bank and had a line of credit sufficient to fund a $12.5 million loan. When Green was unable to secure the $125,000 fee from another source, Eli Boyer, his friend and financial advisor, provided the money.

When the Dai–Ichi Bank endorsement was not forthcoming and Green complained repeatedly, Green was introduced to Binette, who represented himself as an official of UIBT. Binette showed Green some letters of credit issued by UIBT, which purportedly were extended to ACC for large sums of money. Bernard then told Green that ACC

was prepared to fund not just the initial $12.5 million, but the entire $61 million required to complete the project. Green and Bernard signed a "commercial security agreement" in connection with the purported $61 million loan. Needless to say, Green never received the Dai–Ichi Bank endorsement or the $12.5 million (let alone $61 million) loan, nor did he have his commitment fee returned to him.

In the third scheme, Huei–Li Chen and her husband Bin Chen, who were introduced to the defendants and their other co-defendant by Binette, agreed to loan $1.5 million to ACC for the exclusive purpose of purchasing a bank. The Chens understood ACC to be owned by a group of men including Binette, Ferrera, Bernard and Graffia. At her husband's request, Huei–Li Chen entered into an agreement relating to the loan, and as collateral for the loan, which was supposed to be paid back in one year, ACC agreed to provide Chen with a letter of credit issued by the infamous UIBT. ACC also agreed to give Chen an ownership interest in the purchased bank. After receiving false financial information regarding ACC and UIBT and a worthless letter of credit issued by UIBT, Chen wired the $1.5 million (which she obtained from her husband) to ACC's bank account. Unfortunately, Graffia and Bernard did not buy a bank with the borrowed money, nor did they pay the money back to Chen.

Neither of the corporate shells used in the schemes had any physical facility and both were owned by defendants or their co-defendants. Graffia and Bernard created and disseminated financial information to Chen, Green and Patrick that falsely represented that ACC had over $100 million in assets. The defendants and their co-defendants also created and disseminated financial informa-

tion to Chen that falsely represented that UIBT had over $1.2 billion in assets.

## II.

The defendants first challenge the district court's April 5, 1996, order dismissing certain counts of the superseding indictment and striking all references to a scheme to defraud involving the fraudulent Mexican promissory notes. They argue that the order violated the Fifth Amendment because the narrowed charges were not resubmitted to the grand jury. Their basic argument is that the Mexican Note evidence was inextricably intertwined with the remaining fraud allegations and that it is impossible to know whether the grand jury would have viewed the indictment on the remaining fraud counts the same way had they not been "awed" by evidence of an $11 billion Mexican Note scheme. Therefore, they argue, the restructuring of the superseding indictment eliminated essential portions and elements of the crimes charged and created a situation where it is impossible to know that the crimes for which the defendants were convicted were crimes regarding which the grand jury would have returned an indictment.[1]

In general, an indictment may not be "amended except by resubmission to the grand jury." *United States v. Leichtnam*, 948 F.2d 370, 376 (7th Cir.1991) (citing *Russell v. United States*, 369 U.S. 749, 770, 82 S.Ct. 1038, 1050–1051, 8 L.Ed.2d 240). However, an indictment may be narrowed, either constructively or in fact, without resubmitting it to the grand jury. See *United States v. Miller*, 471 U.S. 130, 135–145, 105 S.Ct. 1811, 1814–1820, 85 L.Ed.2d 99; *United States v. Soskin*, 100 F.3d 1377, 1380 (7th Cir.1996). Narrowing an indictment that charges a conspiracy or scheme to defraud to

---

1. For example, the defendants point out that the original form of the superseding indictment alleged that the four defendants defrauded Green by virtue of a claim that they could finance his project through the use of the Mexican Notes. The Green transaction involved a project in Mexico, and a Mexican citizen (Green) seeking financing. They also direct our attention to language in the superseding indictment which says that the conspiracy began in July 1990 and continued until November 1993. The defendants tell us that the only overt acts alleged in furtherance of the conspiracy as late as 1993 relate to the Mexican Notes. Finally, Graffia and Bernard claim that without the linkage forged by the Mexican Notes there was little evidence tying them to Ferrera and Binette, two disreputable characters to whom a link was greatly disadvantageous for the defendants. As a result, they say it is unclear whether there would have been an indictment returned alleging that they were co-conspirators of Ferrera and Binette in the absence of the Mexican Note evidence.

reflect a smaller version of the same conspiracy or scheme does not require resubmission to the grand jury. See *Miller*, 471 U.S. at 135–145, 105 S.Ct. at 1814–1820; *Leichtnam*, 948 F.2d at 377.

The district court's order amended the superseding indictment to delete three offenses that had been charged by the grand jury (clearly falling within the confines of *Miller* and *Soskin*) and to change three of the Counts so that they alleged a narrower conspiracy or scheme. In Count One, the superseding indictment charged the defendants with a conspiracy that had three separate objectives: (i) schemes to defraud based on the Mexican Notes scheme and the Patrick, Green and Chen schemes; (ii) to falsely make counterfeit securities of a foreign government; and (iii) to utter counterfeit securities of a foreign government. It is relatively easy to see from this that the district court's order striking the references to the Mexican Notes scheme resulted in a permissible amendment of the superseding indictment; what was left was simply a narrower version of the conspiracy alleged.[2] See *United States v. Duff*, 76 F.3d 122, 126 (7th Cir. 1996), *certiorari denied sub nom.*, — U.S. ——, 117 S.Ct. 148, 136 L.Ed.2d 94 ("a prosecutor may elect to proceed on a subset of the allegations in the indictment, proving a conspiracy smaller than the one alleged"); *United States v. Kuna*, 760 F.2d 813, 819 (7th Cir.1985) ("scheme proven was included in the scheme charged and thus, under *Miller*, there was no amendment"). Similarly, the only allegation deleted from Count Three as a result of the district court order was the allegation that Graffia proposed to Green that ACC finance his project using some of the fraudulent Mexican Notes. The only allegation removed from Count Four was that Bernard, Graffia and their codefendants used

a portion of the $1.5 million that they fraudulently obtained from Chen to pay the expenses in creating the bogus Mexican Notes. These matters are surplusage to the fraudulent activity alleged in those counts and may be removed without resubmission to the grand jury. See *United States v. Quintanilla*, 2 F.3d 1469, 1475 (7th Cir.1993). We also find that defendants cannot truthfully claim that the narrowing of the charges against them in this manner unfairly prejudiced their defense or created a risk of double jeopardy. See *United States v. Thompson*, 23 F.3d 1225, 1230 (7th Cir.1994).[3]

In short, the district court's order did not broaden the charges against Bernard or Graffia so as to present the trial jury with more or different offenses than the grand jury charged, nor did it alter any material element of any of the three fraudulent schemes presented to the trial jury. As such, the narrowed charges were not required to be resubmitted to the grand jury.

### III.

■ Defendants next claim that the district court improperly restricted the scope of their cross examination of certain of the alleged victims of the defendants' fraud. Graffia and Bernard claim that from the outset of the proceedings in the district court, they had asserted that they were legitimate businessmen who entered into legitimate agreements and that the parties with whom they became involved failed to perform their obligations under the agreements. By failing to allow the defendants to cross-examine the victims regarding certain "business related misdeeds" and "dubious" financial dealings (D. Br. at 34), Graffia and Bernard maintain that the district court violated their Sixth Amendment right to confrontation.

---

2. In fact, in proceedings before the district court, Graffia's counsel admitted, more than once, that the proposed amendments to the superseding indictment were only taking out certain of the conspiratorial objectives. (Tr. 16 and 21; R. 327)

3. This Court is especially unpersuaded by the defendants' argument that, following the removal of references to the Mexican Notes scheme from the superseding indictment, there was no reasonable basis to believe that an indictment would

have been returned as to the remaining allegations. (D. Br. at 23) That argument ignores the fact that a jury found the defendants guilty beyond a reasonable doubt on those very same allegations; there is no reason to think a grand jury would not have at least returned an indictment on those allegations. In any event, such an analysis, which looks at the influence of an amendment on the grand jury's actions, is not the proper one under *Miller*.

An example of the type of evidence the defendants claim they were barred from eliciting at trial is evidence relating to whether Green was aware that the $125,000 he had fronted for the transaction was obtained by Eli Boyer in violation of a fiduciary duty to a trust fund. Defendants claim that this information goes to whether Green was in fact defrauded at all. The defendants appear even more disturbed by the district court's failure to allow them to fully develop evidence that Bin Chen, who had been himself convicted of fraud, was using some of his fraud proceeds in the ACC/UIBT transaction. They claim that neither Mr. Chen, a "convicted swindler," nor Ms. Chen, his "front," had any right to receive repayment of the $1.5 million loan to ACC and that there is every reason to believe that the Chens were not being defrauded by Graffia and Bernard, but were in fact attempting to transfer the fraudulent proceeds to Binette (Mr. Chen's partner in other businesses and a social acquaintance) without the knowledge of Graffia and Bernard.

■■■ In granting the government's motions in limine, the district court reasoned that the sources of the funds of which Green and Chen were defrauded were not relevant. In general, this Court reviews such decisions for an abuse of discretion. See *United States v. Sasson*, 62 F.3d 874, 882 (7th Cir. 1995), *certiorari denied*, ─── U.S. ───, 116 S.Ct. 953, 133 L.Ed.2d 876. We will give the district court wide latitude and allow it to set "reasonable limits on the scope and extent of cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety or interrogation that is repetitive or only marginally relevant." *Id.* (citations omitted). But if a defendant's Sixth Amendment right to confrontation is implicated, we review the district court's rulings de novo. See *Id.* To make that determination we must "distinguish between the core values of the confrontation right and more peripheral concerns which remain within the ambit of the trial judge's discretion," focussing on the purpose

of the cross-examination and the extent of the limitation. *United States v. Hernandez*, 84 F.3d 931, 933–934 (7th Cir.1996). Because we find that the district court only "minimally curtailed cross-examination on [a] peripheral issue," we will review the decision for abuse of discretion.[4] See *United States v. Saunders*, 973 F.2d 1354, 1358–1359 (7th Cir. 1992), *certiorari denied*, 506 U.S. 1070, 113 S.Ct. 1026, 122 L.Ed.2d 171.

■■■ The district court did not abuse its discretion in precluding the defendants from questioning Green about his accountant's alleged misconduct in obtaining the $125,000 that Green used for payment of a commitment fee to ACC. That evidence would not be probative of whether the defendants' conduct was fraudulent. Nor would it be relevant to the defendants' contention that Green was unable to perform on the contract because he did not possess the required collateral prior to the closing of the loan, because the $125,000 was unrelated to the collateral Green needed to produce and Bernard and Graffia were not precluded from presenting evidence that the reason they kept Green's money was because he did not produce appropriate collateral. Similarly, the district court did not abuse its discretion in barring the defendants from questioning Chen regarding whether the $1.5 million loaned by her to ACC was proceeds from a fraud perpetrated by her husband. The defendants' conduct is not eliminated or lessened by the fact that they stole money that had previously been stolen. As for the defendants' theory that the Chens were attempting to transfer the $1.5 million to Binette without the knowledge of Graffia and Bernard, it appears that the defendants did not raise this argument in the district court, and therefore waived it, and in any event, this type of very speculative theory is factually flawed (the defendants kept a large portion of the $1.5 million) and prejudicial and is properly excluded under Federal Rule of Evidence 403.

---

4. In their brief before this Court, the defendants admit that they were not attacking the credibility of the witnesses involved or attempting to demonstrate bias. (Reply Br. at 5.) In any event,

attack on the general credibility of a witness does not directly implicate the Sixth Amendment confrontation right. See *Hernandez*, 84 F.3d at 934.

 We also note that even if the district court erred in excluding the evidence concerning the source of the funds that the defendants stole from Green and Chen, the error is harmless, because it could not have had a "substantial influence over the jury" given the overwhelming evidence against the defendants. See *Saunders*, 973 F.2d at 1359

## IV.

 Finally, defendants contend that the district court erred in giving the jury an "ostrich instruction." The district court instructed the jury that:

You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly, as I have used that word.

(Tr. 1246; R. 235.) Graffia and Bernard do not quibble with the wording of the instruction; they argue instead that such an instruction was inappropriate because the government had neither alleged nor proven that the defendants had failed to investigate any parties with whom they purportedly were dealing. They claim that there was no evidence to support the proposition that the defendants looked away when they found themselves enmeshed with the likes of Ferrera, Binette or Gordon Hazlewood. In fact, they argue, evidence was presented that they exercised due diligence in investigating the parties with whom they dealt.

 This Court reviews the propriety of giving the contested instruction for an abuse of discretion, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in its favor. See *United States v. Vega*, 72 F.3d 507, 516–517 (7th Cir.1995), *certiorari denied sub nom.*, — U.S. —, 116 S.Ct. 2529, 135 L.Ed.2d 1053; *United States v. Fauls*, 65 F.3d 592, 598 (7th Cir.1995), *certiorari denied*, — U.S. —, 116 S.Ct. 1697, 134

L.Ed.2d 796. An ostrich instruction is appropriate if the defendant "claims a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance." *United States v. Neville*, 82 F.3d 750, 760 (7th Cir.1996), *certiorari denied*, — U.S. —, 117 S.Ct. 249, 136 L.Ed.2d 177 (citations omitted). If the facts of a case require the jury to make a "binary choice" between "actual knowledge" and "complete innocence," the ostrich instruction should not be given. See *United States v. Bigelow*, 914 F.2d 966, 970–971 (7th Cir. 1990), *certiorari denied sub nom.*, 498 U.S. 1121, 111 S.Ct. 1077, 112 L.Ed.2d 1182.

 At the urging of the defendants, the district court instructed the jury that "The defendants have offered evidence of their good faith in making the representations alleged in the indictment. Good faith is a complete defense to the crime of wire fraud." (Tr. 1246; R. 235.) Against this defense, the government presented circumstantial evidence that could be read to show that Bernard and Graffia, at a minimum, should have been prompted to investigate UIBT and Hazlewood. For example, the initial balance sheet for UIBT listed in excess of $4 billion in assets and only $43,000 in liabilities, which is strong evidence that UIBT was not a legitimate bank; the defendants should have seen that this required further investigation. In light of evidence like this, which we view in the light most favorable to the government, we cannot say the district court abused its discretion in finding that there were facts and evidence in the case that supported an inference of deliberate ignorance.[5] See *United States v. Strickland*, 935 F.2d 822, 827–828 (7th Cir.1991), *certiorari denied*, 502 U.S. 917, 112 S.Ct. 324, 116 L.Ed.2d 265.

## V.

For the reasons discussed above, the decision of the district court is AFFIRMED.

---

5. In any event, even if we had found that the district court erred in giving the ostrich instruction, the error is harmless in this case, because substantial evidence was presented at trial that

Graffia and Bernard in fact knew that, at the very least, UIBT and Hazlewood were frauds. See *United States v. Holland*, 831 F.2d 717, 722–723 (7th Cir.1987).