**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Nazario MOJICA, Julio G. Miranda, David Hruza and Jesus Sandoval, Defendants–Appellants.**

Nos. 98–1911, 98–2028, 98–2029 and 98–2737.

United States Court of Appeals, Seventh Circuit.

Argued April 15, 1999.

Decided July 20, 1999.

Sean M. Berkowitz (argued), Katten, Muchin & Zavis, Chicago, IL, for Plaintiff–Appellee.

Raymond D. Pijon (argued), Chicago, IL, for Defendant–Appellant Nazario Mojica.

Robert A. Korenkiewicz (argued), Chicago, IL, for Defendant–Appellant Julio G. Miranda.

Terence MacCarthy, Office of the Federal Defender Program, Raymond D. Pijon (argued), Chicago, IL, for Defendant–Appellant David Hruza.

Richard R. Mottweiler, Raymond D. Pijon (argued), Chicago, IL, for Defendant–Appellant Jesus Sandoval.

Before CUDAHY, COFFEY and MANION, Circuit Judges.

CUDAHY, Circuit Judge.

Nazario Mojica, Julio Gerardo Miranda, David Hruza and Jesus Sandoval were charged in a two-count superseding indictment with possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a) and 18 U.S.C. § 2 and conspiracy to possess with intent to distribute in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2. The prosecution maintained at trial that Sandoval supplied drugs from his home in San Francisco to various individuals in the Chicago area, including Mojica, Hruza and Miranda. Hruza owned and operated an auto repair shop known as Supreme Auto and employed Mojica and Miranda as mechanics. These three allegedly used Supreme Auto to receive and distribute drugs and collect money. A jury convicted Sandoval, Mojica and Hruza on both counts and Miranda on the possession count alone. Mojica, Hruza and Miranda were sentenced to 188 months imprisonment, five years supervised release, a mandatory special assessment and a $1,000 fine. Sandoval, who had health problems, was sentenced separately and received a term of 10 years imprisonment and five years supervised release.

Each of the four defendants now appeals his conviction and sentence, contending that he did not receive a fair trial because the district court erred (1) in allowing the government to introduce evidence of an uncharged drug conspiracy, and (2) in refusing to allow the defense to cross-examine the government's main witness about his admitted drug use. Mojica and Miranda also challenge (3) the sufficiency of the evidence supporting their convictions. Finally, Hruza and Miranda appeal (4) the district court's refusal at sentencing to grant a two-point reduction for minimal participation in the offense. We affirm on all issues.

*Background*

In October 1994, the Federal Bureau of Investigation (FBI) intercepted a 100–kilogram load of cocaine which was being transported in a U–Haul truck from El Paso to Chicago. The FBI arranged for a controlled delivery of the cocaine in Chicago by one of its agents, Rolando Lopez, who assumed the role of the driver. On November 3, 1994, Lopez checked into a Super 8 motel in the Chicago-area, where he received a telephone call from Arturo Quiroz regarding the delivery. Later, the two men met in the motel parking lot. Quiroz took the keys to the truck and left the scene on foot. Several hours later, FBI agents observed Hruza and Miranda pull into the parking lot in a tow-truck. Having looked over the exterior of the U–Haul truck and checked under the hood, Miranda climbed aboard, started the engine and drove out of the lot after Hruza (who was driving the tow-truck). The FBI agents tailed the trucks to Supreme Auto where Miranda parked on the street. Later that evening, Miranda backed the truck up to the shop door. The FBI moved in

and arrested Quiroz, Hruza and Miranda.[1] Three sealed boxes—containing the 100 kilograms of cocaine—had been unloaded from the back of the truck. No other drugs or drug paraphernalia were found on the premises although some traces of cocaine residue were detected.

Quiroz cooperated with the government, pleaded guilty to certain offenses and, in return for a reduction in his sentence, fingered the defendants. At trial, Quiroz testified that Sandoval directed a drug operation from his home in San Francisco which involved the distribution of drugs in Chicago by Mojica, Hruza and Miranda under the cover of Supreme Auto. Quiroz testified that, early in 1993, shortly after he began working for Sandoval as a drug courier, he met Mojica and Hruza when they came to San Francisco to deliver money to Sandoval. Mojica and Hruza had driven from Chicago in a Lincoln Continental equipped with a hidden compartment. Quiroz later drove the car back to Chicago and left it at Supreme Auto for repairs. Quiroz testified that, on another occasion, he drove the Lincoln Continental to Chicago where he met Mojica, Hruza and Miranda at Supreme Auto. According to Quiroz, Mojica loaded $700,000 (which Quiroz had collected from a buyer) and some of Mojica's own money into the Lincoln's hidden compartment. Quiroz testified about a visit Hruza made to Sandoval's home in 1993 and two other visits by Mojica and Miranda in 1994. Quiroz stated that, in August 1994, he went to Supreme Auto, where, in the presence of Miranda and Hruza, he asked Mojica about money owed to Sandoval and accepted jewelry as payment in lieu of cash. Quiroz made another trip to Chicago some weeks later to collect money that had been brought to Supreme Auto by a buyer and stored in a van for transportation to San Francisco.

Quiroz also testified as to the events of November 3, 1994—the day of the drug bust at Supreme Auto. He explained to the jury that Supreme Auto had not been the intended destination of the 100 kilograms of cocaine. However, on the morning in question, Quiroz began to have doubts about the original plan and, on Sandoval's advice, opted to use Supreme Auto. Quiroz testified that he telephoned Mojica and told him that he had a delivery. Miranda was dispatched to pick Quiroz up and bring him to Supreme Auto, where Quiroz had a brief conversation with Mojica, Hruza and Miranda about the delivery. Quiroz then called Lopez and put Mojica on the line to arrange the pick-up. After the call, Mojica told Hruza and Miranda that they were going to pick up the cocaine. Quiroz testified that he, Hruza and Miranda drove to a McDonald's restaurant across the street from the Super 8 motel. Quiroz left the others at the McDonald's and went to the motel parking lot where he met Lopez and collected the keys to the truck. He then returned to the McDonald's and gave Miranda the keys. Later that evening, Quiroz was at Supreme Auto when the cocaine was unloaded from the truck. Quiroz testified that he, Mojica and another man unloaded the three boxes from the back of the truck while Hruza and Miranda stood nearby. At trial, the government introduced telephone records confirming that, on November 3, 1994, calls were made from phones used by Quiroz to phone numbers registered to Sandoval and Supreme Auto. Other documentary evidence included Sandoval's personal phone book, which listed numbers for Supreme Auto and for Mojica and Hruza, and Quiroz's phone book, which contained a number for Mojica.

Miranda testified in his own defense and, of course, presented the jury with a somewhat different version of events. Miranda admitted that, on the morning in question, he picked up Quiroz at Hruza's

---

1. The charges against these defendants were subsequently dismissed. Some time later, Hruza and Miranda were rearrested and, together with Mojica and Sandoval, charged with the offenses contained in the present indictment.

request but stated that, on his return to Supreme Auto, he simply resumed his work in the shop. Shortly thereafter, Hruza asked him to accompany him to pick up a car. Miranda admitted going to the McDonald's with Hruza and Quiroz and conceded that Quiroz left them for a short time, ostensibly to go to the bathroom. When Quiroz returned, he told them that the car would not start and that they would need a tow-truck. Hruza and Miranda then returned to Supreme Auto, got a tow-truck and drove to the hotel parking lot where the U–Haul truck was parked. According to Miranda, he jump-started the truck and drove it back to Supreme Auto believing that it needed repairs. Later that evening, he moved the truck from the street to the shop door so that he could work on it. At that point, the FBI agents moved in. Miranda denied knowing that there were drugs in the truck and stated that he never assisted Quiroz in any drug-related activity.

At trial, the government sought to bolster its case by presenting evidence that the alleged conspirators used Supreme Auto to deal drugs to Eduardo Rivera, also known as Lalo, who ran an operation in Milwaukee. Lalo was the target of a federal indictment in Wisconsin—entirely separate from the present case—charging a conspiracy to distribute cocaine in the Milwaukee area. At trial, Fernando Velasco–Najar, Lalo's agent in his dealings with Supreme Auto, testified on behalf of the government.[2] He told the jury that, on several occasions in August and September 1994, he bought cocaine from Miranda at Supreme Auto. On these occasions, he drove to Supreme Auto in a car equipped with a hidden compartment in which the cocaine was stored for transportation to Milwaukee. Najar testified that he understood from Lalo that Hruza had constructed the hidden compartments in Lalo's vehicles. He also testified that Lalo had referred to Supreme Auto as "Mojica's shop." Finally, Najar testified about entries in ledgers detailing Lalo's drug deals with Supreme Auto. Miranda countered Najar's testimony by telling the jury that he had never seen Najar prior to trial and that he had not sold drugs to Lalo.

*Single Conspiracy or Dual Conspiracies*

■ Count I of the second superseding indictment charged the defendants with conspiracy to possess with intent to distribute wholesale quantities of cocaine in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2. Count II charged them with possession with intent to distribute approximately 100 kilograms of cocaine in violation of 21 U.S.C. § 841(a) and 18 U.S.C. § 2. Paragraph 3 of Count I alleged that Mojica, Hruza and Miranda used Supreme Auto as a place to receive wholesale quantities of cocaine and to distribute cocaine to customers for resale to retail clients. Paragraph 4 charged these defendants with using Supreme Auto as a site to receive money from customers as payment for cocaine and to load money into vehicles for transportation to suppliers. Finally, paragraph 6 alleged that Hruza installed hidden compartments in vehicles that were used to transport cocaine and money. At trial, the government introduced the following evidence relating to the Supreme Auto defendants' dealings with Lalo and Najar: (1) Najar's testimony regarding his visits to Supreme Auto and his dealings with Mojica, Hruza and Miranda; (2) Najar's ledgers detailing Lalo's drug deals; and (3) Lalo's out-of-court statements to Najar that Supreme Auto was Mojica's shop and that Hruza had installed hidden compartments in cars for storing drugs and money.[3] At the close of the govern-

---

**2.** Less than a week prior to the drug bust at Supreme Auto, Najar had been arrested when police discovered 38 kilograms of cocaine inside a hidden compartment in a car in which he and a companion, Rosalie Gomez, were driving. Najar cooperated with authorities and provided them with information regarding his involvement in drug transactions conducted at Supreme Auto.

**3.** The government also presented the testimony of Najar's companion on the day of his

ment's case-in-chief, the defendants moved for a judgment of acquittal on the ground that the government had improperly introduced evidence relating to a second conspiracy (the Milwaukee conspiracy) that was beyond the scope of the conspiracy charged in the present indictment (the San Francisco conspiracy). The district court denied the motion, reasoning that the government had established the existence of a single conspiracy involving Sandoval, the Supreme Auto defendants and the Milwaukee purchasers.

■ The defendants revisit this argument on appeal, asserting a variance between the government's indictment and its proof, i.e. that the evidence at trial established facts materially different from those alleged in the indictment. Specifically, the defendants assert that the government established two distinct conspiracies whereas the indictment charged only one. "A defendant asserting a claim of variance will succeed in obtaining reversal of his conviction only if he establishes that (1) the evidence presented at trial was insufficient to support the jury's finding of a single conspiracy, and (2) he was prejudiced by the variance." *United States v. Curtis*, 37 F.3d 301, 305 (7th Cir.1994); *see also United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir.1991).[4] For present purposes, the defendants—Sandoval, Mojica and Hruza (but not Miranda who was acquitted on the conspiracy count)—do not

dispute their own participation in the conspiracy charged in the indictment. This is not a case where the defendants dispute the government's characterization of their relationship *inter se*. Rather, the defendants dispute that the conspiracy extended to Lalo and Najar. Thus, the implications of the single conspiracy versus dual conspiracies issue in this case are essentially evidentiary: the defendants contend that since the defendants were not charged with offenses relating to the Milwaukee connection, the admission of any evidence touching upon that subject was irrelevant and prejudicial.[5] Moreover, as we shall see, the existence of a single conspiracy enabled the government to invoke the co-conspirator exception to the rule against hearsay. *See* FED.R.EVID. 801(d)(2)(E).

■ The existence of a single conspiracy is a finding of fact which we will upset only for clear error. *See United States v. Narvaez*, 995 F.2d 759, 762 (7th Cir.1993). The government may prove a conspiracy by purely circumstantial evidence since "by its very nature, a conspiracy is conceived and carried out clandestinely." *United States v. Sasson*, 62 F.3d 874, 886 (7th Cir.1995) (internal quotation and citation omitted). A single conspiracy exists where persons join together to further a common design or purpose. A participant need not know all of his co-conspirators nor participate in every aspect of the conspiracy. "All that is required is that the

---

arrest, Rosalie Gomez, that she and Najar transported cocaine in a hidden compartment in a car owned by Lalo.

4. In a similar vein, the defendants argue that the indictment is duplicitous insofar as it joins two conspiracies—and therefore two separate offenses—in a single count. *See United States v. Marshall*, 75 F.3d 1097, 1111 (7th Cir. 1996). The government contends that the defendants have waived the duplicity argument by failing to raise it before the district court. In their reply brief, the defendants assert that duplicity was raised in some shape or form at several stages in the proceedings below. We are satisfied that the issue has been adequately preserved for purposes of appeal. However, because the indictment

charged only one conspiracy and because the defendants' argument essentially goes to proof, we believe that their claim is more appropriately cast as a variance issue and we resolve it on that basis.

5. The defendants point out that the government initially brought a pre-trial motion to exclude evidence of the Milwaukee connection. The defendants argue that the government should not have been allowed to do an about-turn and rely on the evidence at trial. Since the defendants initially sought to introduce the evidence and later contested its admission, we believe that this argument cuts both ways. In any event, we decline to pass judgment on the pre-trial posturing of either side.

conspirators knowingly embrace the common criminal objectives." *United States v. Sababu,* 891 F.2d 1308, 1323 (7th Cir.1989). Moreover, "[a]s long as the conspiracy continues toward its goal to achieve a common objective, it remains a single conspiracy despite the fact that participants may change or perform different roles or functions at different times." *United States v. Marshall,* 985 F.2d 901, 907 (7th Cir.1993).

This case fits the bill. The evidence at trial showed that Sandoval supplied drugs to Mojica, Hruza and Miranda who, in turn, distributed drugs to Najar (on Lalo's behalf) in exchange for money. The jury heard that Lalo and Najar had an ongoing cooperative relationship with the Supreme Auto defendants that was built on more than mere buyer-seller transactions.[6] *See United States v. Mims,* 92 F.3d 461, 465 (7th Cir.1996); *United States v. Edwards,* 77 F.3d 968, 974 (7th Cir.), *vacated and remanded for resentencing on other grounds,* 518 U.S. 1014, 116 S.Ct. 2543, 135 L.Ed.2d 1064 (1996). As links in a single chain of drug distribution, Sandoval, the Supreme Auto defendants and the Milwaukee purchasers joined together to pursue a common scheme. Given the "elastic and sprawling" nature of drug conspiracies, this scenario of mutual dependency was sufficient "to permit an inference" of a single conspiracy. *Curtis,* 37 F.3d at 305 (internal quotation and citation omitted).

The defendants point to a lack of evidence that Sandoval had any direct relationship with Lalo and Najar. But this is not fatal for, as noted, a conspiracy can exist "even if each participant does not know the identity of the others or does not participate in all the events." *United States v. Shorter,* 54 F.3d 1248, 1255 (7th Cir.1995). *See also United States v. Cerro,* 775 F.2d 908, 911 (7th Cir.1985) ("A conspiracy is an agreement; and to be a party to an agreement you must know something of its general scope and objective though not necessarily its details."). Without pur-

chasers, none of the defendants, including Sandoval, would get paid; similarly, from Lalo's and Najar's perspective, without a supplier, there would be no drugs. Sandoval knew generally of Lalo's and Najar's existence—even if he did not know their identity—and *vice versa.*

■ On a related theme, the defendants argue that Lalo and Najar had no direct connection to San Francisco and they point out that the government's evidence—notably Quiroz's testimony—characterized San Francisco as the hub of the conspiracy. Other evidence at trial, however, suggested that Supreme Auto may have been the hub or, at the very least, a major operational center. Certainly, Sandoval's operations in San Francisco and those of the Supreme Auto defendants in Chicago were both central to the success of the conspiracy. And the defendants have cited no authority to support the proposition that a conspiracy must necessarily have only one hub. In any event, the fact that the Supreme Auto defendants—three of the four defendants in this case—were the link between Sandoval and the Milwaukee purchasers diminishes the need to distinguish between the so-called San Francisco and Milwaukee connections. *See Curtis,* 37 F.3d at 306 (noting that the need to distinguish a single conspiracy from multiple conspiracies diminishes when the defendant is the common link). Moreover, the existence of a separate indictment charging a Milwaukee conspiracy is not inconsistent with the existence of the conspiracy charged in this case nor, specifically, of Lalo's and Najar's role in it. After all, an individual may, without contradiction, be a member of two conspiracies at the same time. *See United States v. Noble,* 754 F.2d 1324, 1330 (7th Cir.1985).

In summary, the evidence at trial went directly to the issues charged in the indictment. Najar's testimony relating to his dealings at Supreme Auto was probative of

---

**6.** There was evidence, for example, that the parties advanced credit to each other and that

Hruza constructed hidden compartments in Lalo's cars for storing drugs and money.

the allegation that Mojica, Hruza and Miranda used Supreme Auto as a location to distribute drugs and collect money. That same testimony supported the allegation that Hruza had installed hidden compartments in vehicles for transporting drugs and money.[7] The evidence was sufficient to establish the existence of a single conspiracy—involving all of the defendants and the Milwaukee purchasers—beyond a reasonable doubt. There is no basis for believing that the jury was confused by this evidence or that the defendants were at risk of being held accountable for activities falling outside the scope of the indictment. The defendants' variance claim fails.

 The defendants are left with a discrete evidentiary challenge. Consequent upon its finding of a single conspiracy in this case, the district court held that Lalo's statements were admissible under the co-conspirator exception to the rule against hearsay and that Najar's ledgers were admissible under the business records exception. Since the defendants do not contest the introduction of the ledgers on appeal, the only outstanding issue relates to Lalo's out-of-court statements. As an evidentiary ruling, we review the district court's decision to admit the statements for abuse of discretion. *See United States v. Graffia,* 120 F.3d 706, 712 (7th Cir.1997).

 A statement is not hearsay if it is made by "a co-conspirator of a party during the course and in furtherance of the conspiracy." FED.R.EVID. 801(d)(2)(E). To avail itself of the exception, the government must show that (1) a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy and (3) the statements were made in the course and in furtherance of the conspiracy. *See United States v. Powers,* 75 F.3d 335, 339 (7th Cir.1996); *United States v. Stephenson,* 53 F.3d 836, 842 (7th Cir.1995); *United States v. Nichols,* 910 F.2d 419, 420 (7th

Cir.1990). Here, the statements at issue—that Supreme Auto was Mojica's shop and that Hruza installed hidden compartments in cars—were made by Lalo to Najar and were introduced at trial against Mojica and Hruza, respectively. We have already established that each of the individuals in question—Lalo (the declarant), Najar (the witness) and Mojica and Hruza (the defendants)—was a member of the single conspiracy charged in this case. Indeed, for the purposes of the exception we need not go so far; it is enough that Lalo, Mojica and Hruza were members of the same conspiracy. Since the statements were made by Lalo to Najar in the context of drug deals concluded at Supreme Auto, they were made in the course and in furtherance of the conspiracy. In these circumstances, the decision to admit these statements into evidence under the co-conspirator exception to the rule against hearsay was within the district court's discretion.

*Cross–Examination of Government Witness About Prior Drug Use*

 The defendants also appeal the district court's decision not to allow defense counsel to cross-examine Quiroz about his drug use. We review that decision for abuse of discretion. *See Graffia,* 120 F.3d at 712 (noting that "[w]e will give the district court wide latitude and allow it to set reasonable limits on the scope and extent of cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety or interrogation that is repetitive or only marginally relevant.") (internal quotation and citation omitted). Evidence of a witness' prior drug use may be admitted insofar as it relates to his possible inability to recollect and relate. *See United States v. Robinson,* 956 F.2d 1388, 1397 (7th Cir.1992). However, we have recognized that "there is considerable

---

7. In this regard, Najar's testimony was confirmed by Gomez who testified that she and

Najar transported cocaine in a hidden compartment in one of Lalo's cars.

danger that evidence that a witness has used illegal drugs may so prejudice the jury that it will excessively discount the witness' testimony." *United States v. Cameron,* 814 F.2d 403, 405 (7th Cir.1987). Thus, a district court may refuse cross-examination on the issue where memory or mental capacity is not legitimately at issue and the evidence is offered solely as a general character attack. *See id.; United States v. Berry,* 60 F.3d 288, 294 (7th Cir.1995).

In the present case, the district court initially stated that the defendants would be allowed to cross-examine Quiroz about his prior drug use provided they could proffer evidence that such use impaired his ability to recall and relate relevant events. At trial, the district court conducted a *voir dire* examination of Quiroz on the issue outside the presence of the jury. On the basis of this examination and of Quiroz's performance at trial, the court concluded that Quiroz's ability to recall past events was excellent and that there was nothing in the record to suggest otherwise. The defendants dispute this determination, arguing that there were contradictions in Quiroz's testimony. They point out that Quiroz claimed that he did not use cocaine on drug-related trips to Chicago but later admitted using cocaine on one such trip to Los Angeles; that he testified that he snorted rather than smoked cocaine but later conceded that he may have tried smoking it on one specific occasion; and that, while admitting to being a cocaine addict, Quiroz testified that his cocaine use did not affect his ability to participate in the drug transactions described nor his subsequent ability to recall and relate events.

We believe that the district court handled the issue appropriately. The court conducted a *voir dire* examination and carefully weighed whether to allow cross-examination on prior drug use. We view with deference the court's findings that Quiroz's ability to recall and relate events was not impaired in any way. *See United*

*States v. Scott,* 19 F.3d 1238, 1242 (7th Cir.1994); *United States v. Causey,* 9 F.3d 1341, 1344 (7th Cir.1993). The inconsistencies in Quiroz's testimony cited by the defendants are no more than minor discrepancies and, in any event, do not in themselves establish that his memory was impaired. In the circumstances, we see no reason to disturb the district court's ruling.

*Sufficiency of the Evidence*

 Miranda and Mojica seek to have their verdicts overturned on the ground that there was insufficient evidence to support their convictions. In reviewing this issue, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Griffin,* 150 F.3d 778, 784 (7th Cir.1998) (internal quotation and citation omitted). *See also United States v. Laurenzana,* 113 F.3d 689, 693 (7th Cir.1997). The defendants are not required to demonstrate that their convictions are not supported by any evidence at all, but rather that the evidence cannot support a finding of guilt beyond a reasonable doubt. *See United States v. Rahman,* 34 F.3d 1331, 1337 (7th Cir.1994).

 Miranda challenges his conviction on the Count II charge of possession with intent to distribute. He contends that his acquittal on the Count I conspiracy charge is proof of the insufficiency of the evidence against him because the government's principal evidentiary source—Quiroz—was the same for both counts. However, the Supreme Court has made plain that each count in an indictment must be treated as a separate indictment and an acquittal on one count does not dictate an acquittal on another count. *See United States v. Powell,* 469 U.S. 57, 62–63, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); *United States v. Castillo,* 148 F.3d 770, 774–75 (7th Cir.1998) (noting that there are several reasons for this approach including the fact that "an individualized assessment of the reason for the inconsistency would be based either on

pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake") (internal quotation and citation omitted).

Miranda asks us to focus on knowledge as a necessary element of the crime of possession with intent to distribute. He contends that the only evidence adduced at trial to support the government's assertion that he knew that the truck contained cocaine was Quiroz's unreliable testimony. Quiroz testified that, on the morning of the drug bust, Miranda had been privy to conversations at Supreme Auto regarding the U–Haul delivery. Quiroz testified further that Miranda and Hruza waited for him at the McDonald's while he met with Lopez in the motel parking lot and that on his return to the McDonald's, he handed Miranda the keys to the truck. The government points out that the jury heard other evidence which suggested that Miranda knew what was going down. The FBI observed Miranda pull into the motel parking lot with Hruza, examine the U–Haul truck, start the engine and drive off. Agents tailed Miranda to Supreme Auto and later observed him back the truck up to the shop door. Miranda countered their testimony with his own version of events. According to Miranda, he was merely carrying out his job as a mechanic at Supreme Auto, ignorant of the drug deal going on around him. Miranda denied knowing that there were drugs in the U–Haul truck and stated that he picked up the truck in the motel parking lot on the premise that it needed mechanical repairs. The jury heard and evaluated both versions of events and reached its decision accordingly.[8] In the circumstances, the evidence was sufficient to support the jury's conclusion that Miranda was guilty beyond a reasonable doubt on Count II.

■■■■ Mojica challenges the sufficiency of the evidence against him on two grounds. First, he contends that Najar—who supplied a substantial portion of the evidence in question—should not have been allowed to testify. This is essentially a rehash of the argument about two separate conspiracies discussed above and warrants no further comment here. Mojica's second argument is no more persuasive. Like Miranda, Mojica relies on Miranda's acquittal to undermine the testimony of Quiroz and Najar—the evidentiary lynchpin of the government's case against all of the defendants. For the reasons stated above, we reject this approach. In any event, even if the jury found Miranda's testimony credible in some respect (as Mojica suggests), it is by no means clear that this helps Mojica. In the circumstances, the jury could reasonably have believed that Miranda was a junior and therefore less culpable player in the game. In contrast, the testimony of Quiroz and Najar placed Mojica at the heart of the drug-related activities at Supreme Auto and the FBI surveillance provided further evidence of his participation in the 100–kilogram cocaine delivery of November 3, 1994.[9] The government presented ample evidence from which the jury could conclude that Mojica was guilty beyond a reasonable doubt on both counts.

### Sentencing Reduction for Minor Participation

■■■■ Finally, Hruza and Miranda argue that they were entitled to a reduction in their offense level under U.S.S.G. § 3B1.2 because they were only minor players in Sandoval's drug organization. The district court denied the reduction on the ground that neither Hruza nor Miranda played a minor role with respect to the November 3, 1994 delivery—the conduct for which they were held accountable at sentencing. A district court's decision on minor participation is heavily depen-

8. At sentencing, in overruling Miranda's objection to an obstruction of justice enhancement, the district court stated its belief that Miranda had willfully given false testimony regarding his knowledge of the contents of the U–Haul truck.

9. At sentencing, the district court agreed with the government's assessment that Mojica was probably the most involved of the three (Mojica, Hruza and Miranda).

dent on the facts, and we review that decision for clear error. *See United States v. Lampkins,* 47 F.3d 175, 180 (7th Cir. 1995). The district court's legal conclusions, including interpretations of the scope of a guideline, are reviewed *de novo. See United States v. Tai,* 41 F.3d 1170, 1174 (7th Cir.1994). Each of the defendants has the burden of demonstrating that he is eligible for the reduction. *See United States v. Beltran,* 109 F.3d 365, 370 (7th Cir.1997).

Under the guidelines, a defendant is entitled to a four-level reduction as a minimal participant if he can show that he was "the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2(a), comment (n.1). A defendant is entitled to a two-level reduction as a minor participant if he can show that he was "less culpable than most other participants." U.S.S.G. § 3B1.2(b), comment (n.3). In assessing "relevant conduct" for purposes of determining the base offense level, a district court may hold the defendant responsible for the conduct of others. The reduction allows the court to mitigate the effects of its relevant conduct assessment so as to ensure that a defendant's sentence does not reflect conduct other than his own. Thus, we have consistently held that "[i]n determining the applicability of § 3B1.2, the relevant inquiry is whether the defendant was a minor participant in the crime for which he was convicted." *Griffin,* 150 F.3d at 787 (internal quotation and citation omitted). *See also United States v. Uriostegui-Estrada,* 86 F.3d 87, 90 (7th Cir.1996). Whether a defendant was a minimal or minor participant in other drug-related activity or in a broader conspiracy—above and beyond the conduct for which he was held accountable—is not relevant to our inquiry. *See United States v. Cobblah,* 118 F.3d 549,

552 (7th Cir.1997) (denying a minor role reduction where the defendant was not charged in a larger ongoing conspiracy and was not held accountable for drug quantities beyond what he picked up on a single day); *United States v. Burnett,* 66 F.3d 137, 140 (7th Cir.1995) ("§ 3B1.2 does not ask whether the defendant was minor in relation to the organization, or how easily he could have been replaced; it asks the judge to determine whether he was minor in relation to the conduct for which he was convicted ... and in relation to the crime for which he has been held accountable.").[10]

Miranda contends that the district court should have reduced his sentence by two-to-four levels because he was only a minimal or, at worst, a minor participant in Sandoval's drug operation. He relies on his acquittal on the conspiracy count as confirmation that he was not aware of the scope and structure of his co-defendants' nefarious activities. But Miranda's conviction for possession with intent to distribute relates solely to the 100 kilograms of cocaine delivered to Supreme Auto on November 3, 1994. The issue then is whether the district court erred in finding that Miranda played something more than a minor role with respect to that delivery. Miranda essentially argues that he was less culpable than his co-defendants. However, the record shows that he was present at Supreme Auto on the morning of November 3, 1994 when the delivery of the cocaine was planned. Miranda accompanied Quiroz to the McDonald's, waited for him while he met with Lopez and, afterwards, took the keys to the U–Haul truck. Miranda later went to the motel parking lot with Hruza to pick up the truck containing the cocaine and transported it back to Supreme Auto. Finally, Miranda backed the truck up to the shop

---

**10.** The Tenth Circuit has endorsed this approach. *See United States v. James,* 157 F.3d 1218, 1220 (10th Cir.1998). The Third Circuit, however, has taken a different view. *See United States v. Isaza–Zapata,* 148 F.3d 236, 241 (3d Cir.1998) (disagreeing with *Burnett* and holding that, for purposes of the reduc-

tion, the district court must examine all relevant conduct and not merely the defendant's conduct). Because we are not writing on a clean slate, we decline Hruza's invitation to revisit our prior case law and align ourselves with the Third Circuit.

door immediately prior to the unloading of the cocaine and was present when the boxes were removed from the truck. In the circumstances, Miranda cannot credibly claim that he played a minor, much less a minimal, role in relation to the cocaine transaction of November 3, 1994—the offense for which he was held accountable. *See Lampkins*, 47 F.3d at 181 ("it makes no sense to claim that one is a minor participant in one's own conduct").

■ Hruza claims that he was a minor (rather than a minimal) participant and therefore entitled to a two-level reduction. His case differs from Miranda's in that he was convicted on both counts (possession and conspiracy to possess). But, at sentencing, the district court concluded that the conspiracy conviction added little to the mix. The district court focused on the 100 kilograms of cocaine delivered to Supreme Auto on November 3, 1994, noting that this was a case in which the amount of drugs—valued at approximately one million dollars—drove the sentence.[11] We agree that Hruza's conduct with respect to that delivery points in the same general direction as Miranda—away from the reduction. Hruza was also present at Supreme Auto when the delivery was planned on the morning in question. He accompanied Quiroz and Miranda to the McDonald's and waited while Quiroz collected the keys to the truck. Later, Hruza picked up the U–Haul truck with Miranda and brought it back to Supreme Auto. Finally, Hruza was present when the boxes containing the cocaine were unloaded from the back of the truck. Thus, there was ample evidence that Hruza was directly involved in the planning and execution of the delivery.[12] We endorse the district court's determination that Hruza, like Miranda, was not entitled to a minor role reduction.

AFFIRMED.

11. The district court noted that the size of the November 3 haul—100 kilograms of cocaine—placed Mojica, Hruza and Miranda in a guideline range of 188 to 235 months. *See* Sent. Tr. at 12. Each of these defendants received the minimum term within that range: 188 months imprisonment (plus five years supervised release, a special mandatory assessment of $50 per count and a $1,000 fine). Thus, Miranda received the same sentence as the other two notwithstanding the fact that he was acquitted on the conspiracy count. *Id.* at 32–35.

12. We are mindful that the indictment charged Hruza with conspiracy to receive and distribute wholesale quantities of cocaine and that the jury heard evidence implicating Hruza in drug dealing activity above and beyond the events of November 3, 1994. In his reply brief, Hruza appears to concede that he was held accountable at sentencing solely for the 100–kilogram delivery. At oral argument, the government argued that, even if his conduct were assessed in the more generous context of the broader conspiracy, Hruza still would not qualify for the reduction. We agree that Hruza would be hard pressed to show that he was a minor participant in the ongoing conspiracy to receive and distribute drugs at Supreme Auto. Hruza owned and operated Supreme Auto. He constructed hidden compartments in vehicles for suppliers and customers. And he interacted directly with his co-defendants and other co-conspirators in planning and executing the conspiracy's drug activity. Thus, even from this broader perspective, Hruza's contention that he was no more than a minor figure falls short of the mark.